131 T.C. No. 10


UNITED STATES TAX COURT


WHITEHOUSE HOTEL LIMITED PARTNERSHIP, QHR HOLDINGS-NEW ORLEANS, LTD., TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 12104-03.                    Filed October 30, 2008.


The parties agree that W, a partnership, is entitled to a charitable contribution deduction on account of its having made a qualified conservation contribution to a qualified organization. They disagree as to the amount of the contribution. They further disagree as to whether, if W overstated the amount of the deduction, the overstatement amounted to a substantial valuation misstatement or a gross valuation misstatement and, if either, whether any resulting accuracy-related penalty is excused on account of reasonable cause. P also objects to the appraisal testimony of R's expert witness, A, on the grounds that (1) he is not qualified to testify as an expert as to "facade donations" and (2) even if he is so qualified, his written report is per se unreliable since it is not in conformance with the Uniform Standards of Professional Appraisal Practice (USPAP), and it cannot, for that reason, be received into evidence by the Court pursuant to our duty imposed by Daubert v. Merrell Dow Pharmas., Inc., 509 U.S. 579 (1993), Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), and Fed. R. Evid. 702 to exclude unreliable testimony.

1.  <u>Held</u>:  A is qualified to testify as an expert.

2.  <u>Held</u>, <u>further</u>, Fed. R. Evid. 702 requires that expert testimony be based on "reliable principles and methods", and we will not supplant our responsibility to assess an expert appraiser's reliability by accepting USPAP as the defining standard of reliability; failure to adhere to USPAP may affect the weight we accord to an expert appraiser's testimony; that failure does not, however, necessarily preclude our receiving the expert's testimony into evidence; A's testimony is the product of the application of reliable principles and methods of valuation to sufficient facts and data; it is admissible as expert testimony pursuant to Fed. R. Evid. 702.

3.  <u>Held</u>, <u>further</u>, value of qualified contribution determined: deduction overstated.

4.  <u>Held</u>, <u>further</u>, overstatement is a gross valuation misstatement.

5.  <u>Held</u>, <u>further</u>, accuracy-related penalty applicable because failure to make good-faith investigation of value of contribution precluded reasonable cause exception.


<u>Gary J. Elkins</u> and <u>Andrew L. Kramer</u>, for petitioner.

<u>Linda J. Wise</u>, <u>Robert W. West, III</u>, and <u>Susan S. Canavello</u>, for respondent.

## Contents

FINDINGS OF FACT ........................................................... 5

OPINION .................................................................... 14

I.   Introduction .......................................................... 14

II.  Objection to Mr. Argote's Testimony .................................. 15

     A.   Introduction ..................................................... 15
     B.   Qualification as an Expert Witness ............................... 15
     C.   Reliability ...................................................... 20
          1.   Introduction ............................................... 20
          2.   Qualified Appraisal ........................................ 21
          3.   Exclusion of the Kress Building ............................ 22
          4.   Uniform Standards of Professional
               Appraisal Practice ......................................... 23
          5.   Conclusion ................................................. 26
     D.   Conclusion ....................................................... 26

III. Expert Testimony as to the Value of the Servitude .................... 26

     A.   Introduction ..................................................... 26
     B.   Highest and Best Use Considerations .............................. 30
          1.   Introduction ............................................... 30
          2.   Discussion ................................................. 31
          3.   Conclusion ................................................. 36
     C.   Cost Approach .................................................... 36
          1.   Introduction ............................................... 36
          2.   Before Restriction Reproduction Cost ......... 37
          3.   After Restriction Reproduction Cost .......... 39
          4.   Cost Approach Value ........................................ 40
     D.   Income Approach .................................................. 40
          1.   Introduction ............................................... 40
          2.   Before Restriction Income Approach ........... 41
          3.   After Restriction Income Approach ............ 42
          4.   Income Approach Value ...................................... 43
     E.   Comparable Sales Approach ........................................ 44
          1.   Introduction ............................................... 44
          2.   Before Restriction Comparable
               Sales Approach ............................................. 45
               a.   Mr. Roddewig's Approach ................... 45
               b.   Mr. Argote's Approach ..................... 48
          3.   After Restriction Comparable
               Sales Approach ............................................. 49
          4.   Comparable Sales Approach Value .............. 50

IV.  Value of the Servitude ............................... 51

    A.  Introduction ...................................... 51
    B.  Cost Approach .................................... 52
        1.  Introduction ................................ 52
        2.  First Impression ............................ 54
        3.  Terra Cotta Cost ............................ 56
        4.  External Obsolescence ....................... 58
        5.  Land Value .................................. 59
        6.  Conclusion .................................. 60
    C.  Income Approach .................................. 61
        1.  Introduction ................................ 61
        2.  Mr. Argote's Opinion ........................ 62
        3.  Discussion and Conclusion ................... 62
    D.  Comparable Sales Approach ........................ 66
        1.  Introduction ................................ 66
        2.  Discussion .................................. 66
            a.  Introduction ........................... 66
            b.  Mr. Roddewig's Use of Nonlocal
                Comparables ............................ 67
            c.  His Use of Price Per Room .............. 70
            d.  The Experts' Adjustments ............... 71
            e.  Before Restriction Value ............... 74
                (i)   Introduction ...................... 74
                (ii)  The Pere Marquette Building ....... 75
                (iii) The Bell South Building ........... 77
                (iv)  Magazine Street and Board of
                      Trade Place ....................... 80
                (v)   Conclusion ........................ 83
            f.  After Restriction Value ................ 83
        3.  Conclusion .................................. 88
    E.  Conclusion ....................................... 88

V.  Valuation Misstatement Penalty ...................... 89

    A.  Introduction ..................................... 89
    B.  Gross Valuation Misstatement ..................... 89
    C.  Reasonable Cause Exception ....................... 90
        1.  Introduction ................................ 90
        2.  Discussion .................................. 92
        3.  Conclusion .................................. 94
    D.  Conclusion ....................................... 94

VI.  Conclusion ......................................... 94

APPENDIX ................................................. 95

HALPERN, _Judge_:  By notice of final partnership administrative adjustment (the notice), respondent proposed a reduction of $6,295,000 in the amount of the charitable contribution deduction claimed by Whitehouse Hotel Limited Partnership (the partnership) on its 1997 Form 1065, U.S. Partnership Return of Income (1997 Form 1065).  Respondent also determined that an accuracy-related penalty is applicable.

Unless otherwise noted, all section references are to the Internal Revenue Code in effect for 1997, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The parties agree that the partnership is entitled to a charitable contribution deduction for 1997 on account of its having made a qualified conservation contribution to a qualified organization.  They disagree as to the amount of that contribution.  If we find that the partnership overstated the value of the property constituting the qualified conservation contribution, we must then determine whether that overstatement amounted to a substantial valuation misstatement or a gross valuation misstatement and, if either, whether any resulting penalty is excused on account of reasonable cause.

FINDINGS OF FACT

Introduction

Some facts have been stipulated and are so found.  The stipulation of facts, supplemental stipulation of facts, and second supplemental stipulation of facts, with accompanying exhibits, are incorporated herein by this reference.

At the time the petition was filed, the partnership's principal place of business was in New Orleans, Louisiana.

Background

The partnership is a Louisiana limited partnership formed on December 15, 1995. Its taxable year is a calendar year. On December 21, 1995, the partnership acquired a parcel of improved real property in New Orleans, Louisiana, on the square (block) bordered by Canal, Burgundy, Iberville, and Dauphine Streets. Principally, the parcel consisted of a historic building, the Maison Blanche Building, built between 1907 and 1909, two annexes, one built in the 1920s and the other built in the 1950s, and the land under all. The Maison Blanche Building is on the corner of Canal and Dauphine Streets, while the 1920s annex faces Dauphine Street, and the 1950s annex is on the corner of Dauphine and Iberville Streets. At the time the partnership acquired the parcel, the first through third floors of the Maison Blanche Building were under lease to Maison Blanche, Inc., for use as a department store. The lessee had previously prepaid rent for a term ending in 2004. The upper floors of the building were vacant. The partnership agreed to pay $6 million for the parcel plus additional amounts based on the partnership's "Net Cash Flow" and "Net Capital Proceeds". In September 1996, the partnership paid an additional $625,000 in cancellation of its obligation to pay those additional amounts and for other things. In September 1996, the partnership bought out the remaining term

of the lease for $3,375,938 and obtained the right to use the Maison Blanche name.

On or about October 30, 1997, the partnership purchased additional property in the same block as the Maison Blanche Building, including the Kress Building, which is adjacent to the Maison Blanche Building on Canal Street, and the Kress parking garage, on the corner of Burgundy and Iberville Streets. The Kress Building was built in 1910. The partnership paid $3.4 million for the additional property.

The Maison Blanche Building consists of a base level and a U-shaped tower. The base level includes a basement and five floors, with a mezzanine level between the first and second floors. The tower portion of the building has eight floors. The 1920s annex has five floors, and the 1950s annex has six floors. Exterior street facades of the Maison Blanche Building consist almost entirely of glazed terra cotta; some interior portions of the building (e.g., interior courtyard areas) are primarily constructed of white glazed brick with less extensive terra cotta ornamentation. The Kress Building has six floors.

The Maison Blanche Building is located adjacent to the Vieux Carre (French Quarter) neighborhood of New Orleans. It is in the Vieux Carre National Historic District but not in the locally designated Vieux Carre Historic District. It is also located within the Canal Street Historic District, which is part of the Central Business District. The Central Business District Historic District Landmark Commission (the commission) is the

municipal body with oversight authority over the Canal Street Historic District. The commission is charged with preserving, protecting, and regulating historic districts in the Central Business District. The New Orleans City Council may review, approve, reject, or modify the commission's actions, and the council's decisions are subject to review by the State's courts. The commission assigns ratings to buildings according to their architectural and historic significance. It designated the Maison Blanche Building as a "Category B" building. That rating means the commission determined that the Maison Blanche Building is a building of major architectural importance. The commission does not permit alterations to the exterior of buildings located in the Central Business District until the work is approved by the commission. On June 24, 1996, the U.S. National Park Service determined that the Maison Blanche Building is a certified historical structure.

On February 19, 1997, the partnership and the Ritz-Carlton Hotel Company, L.L.C. (Ritz-Carlton), a Delaware limited liability company, entered into agreements under which the partnership agreed to renovate the Maison Blanche and Kress Buildings, and Ritz-Carlton agreed to operate a Ritz-Carlton Hotel in the renovated buildings. Ritz-Carlton was to receive certain fees and expense reimbursements in exchange for its services.

The Maison Blanche Building, its annexes, the Kress Building, and the Kress parking garage were ultimately developed

into a 452-room Ritz-Carlton Hotel, a 230-room Iberville Suites Hotel, a 75-room Maison Orleans Hotel, the Ritz-Carlton Spa, approximately 20,000 square feet of retail space, and a parking garage for approximately 290 cars. The Ritz-Carlton Hotel, the spa, and the garage commenced operations on October 6, 2000. The remaining facilities commenced operations thereafter.

Creation of the Servitude

On December 29, 1997 (the valuation date), the partnership conveyed certain of its rights in the Maison Blanche Building to a Louisiana nonprofit corporation, Preservation Alliance of New Orleans, Inc., d.b.a. Preservation Resource Center of New Orleans (PRC). The conveyance was by "Act of Donation of Perpetual Real Rights" (the conveyance). A copy of the conveyance, excluding exhibits, is appended hereto. In summary, the conveyance provides that: (1) The owner intends to convert the Maison Blanche Building (described as the "Improvement", to distinguish it from the underlying land) into a hotel; (2) there is no servitude or other encumbrance that would limit the rights conveyed; (3) the rights conveyed (described as the "Servitude" (servitude)) are conveyed in perpetuity; (4) the servitude relates to certain exterior surfaces of the Improvement (referred to as the "Facade" (the facade)); (5) the owner will maintain the facade in a good and sound state of repair; (6) without permission, the owner will do nothing in or to the facade that would alter its appearance; and (7) PRC has the right to require the owner to maintain the facade.

The 1997 Form 1065

On account of the conveyance of the servitude to PRC, the partnership claimed a charitable contribution deduction of $7.445 million on the 1997 Form 1065. In making that claim, the partnership relied on an appraisal made as of September 1, 1998, by M. Richard Cohen (Mr. Cohen), an appraiser, who was of the opinion that, taking into account the value of the Maison Blanche Building both before and after conveyance of the servitude, the diminution of the value of the Maison Blanche Building on account of the conveyance was $7.445 million. The partnership showed that amount as the value of the servitude on a Form 8283, Noncash Charitable Contributions, attached to the 1997 Form 1065. Mr. Cohen signed the "Declaration of Appraiser", constituting part of the Form 8283. The 1997 Form 1065 is dated October 14, 1998.

Examination of the 1997 Form 1065

Respondent examined the 1997 Form 1065 and determined that the $7.445 million charitable contribution deduction should be reduced by $6.295 million since the partnership had not established that the loss of value on account of the conveyance of the servitude exceeded $1.15 million. On account of the size of his reduction in value, respondent determined that an accuracy-related penalty under section 6662(a) is applicable. The notice, described previously, followed.

Petitioner's Expert Witness

Petitioner offered, and the Court accepted, Richard J. Roddewig (Mr. Roddewig) as an expert witness with respect to (1) the valuation of conservation easements and (2) the site selection, feasibility, and valuation of hotels.  The Court received Mr. Roddewig's written report as his direct testimony.[1] Mr. Roddewig is of the opinion that the conveyance of the servitude to PRC by the partnership reduced the value of the Maison Blanche Building and associated properties by $10 million.

Mr. Roddewig is a real estate appraiser and attorney.  He is a member of the Appraisal Institute and he holds its MAI designation.[2]  He is also a member of the Counselors of Real Estate, a professional organization for real estate appraisers and development feasibility analysts.  He conducts his appraisal business from Chicago.  He obtained a temporary license from the State of Louisiana as a Certified General Real Estate Appraiser for the purpose of making his appraisal here under consideration. Before reaching his conclusion as to the loss in value occasioned by the partnership's conveyance of the servitude to PRC (hereafter, sometimes, the value of the servitude) he spent 4 to 6 days in New Orleans.  His staff made additional visits.  Mr.

---

[1]  Generally, we receive an expert's written report into evidence as his direct testimony.  Rule 143(f)(1).

[2]  Recently, in Schwartz v. Commissioner, T.C. Memo. 2008-117 n.8, we said:  "MAI is a designation awarded to qualifying members of the Appraisal Institute * * * .  Within the real estate appraisal community MAI is viewed as the highest regarded appraisal designation."

Roddewig's previous appraisal experience in Louisiana consisted of two or three preliminary appraisals made in the early 1980s of preservation easement grants in New Orleans and a market feasibility study for a site in Lafayette, Louisiana. Mr. Roddewig determined the value of the servitude by estimating the value of the Maison Blanche Building and associated properties both before and after the conveyance of the servitude. He used three approaches: a cost approach, a comparable sales approach, and a modified income approach.

Respondent's Expert Witness

Respondent offered Richard Dunbar Argote (Mr. Argote) as an expert witness with respect to commercial real estate appraisal. Petitioner objected to Mr. Argote's qualification to appraise the servitude. Petitioner also objected to the admission of Mr. Argote's report as his direct testimony on the value of the servitude on the ground that the testimony was unreliable. We reserved ruling on both objections, conditionally accepting Mr. Argote as an expert and conditionally receiving his written report as his direct testimony. We instructed the parties to address petitioner's objections on brief. Mr. Argote is of the opinion that the conveyance of the servitude to PRC by the partnership did not reduce the value of the Maison Blanche Building by any amount.

Mr. Argote is licensed by the State of Louisiana as a Certified General Real Estate Appraiser and as a Real Estate Broker. Like Mr. Roddewig, he is a member of the Appraisal

Institute and holds its MAI designation. He has completed several appraisal courses offered by the American Institute of Real Estate Appraisers. He has attended many other seminars and symposia on a variety of appraisal topics, including hotel and motel feasibility and valuation, partial interest valuation, and determining the highest and best use of commercial properties. From 1986 to 1989, he was a member of the Board of Examiners of the American Institute of Real Estate Appraisers. He has presented several seminars on various appraisal topics relating primarily to commercial real estate.

Mr. Argote has been appraising real estate in Louisiana for over 25 years. From 1990 to 2000, he appraised between 50 and 70 buildings in and around New Orleans that were to be used as, or to be converted into, hotels. About 85 percent of those appraisals were of buildings located within the Central Business District or the Vieux Carre. Over the years, Mr. Argote has appraised every building within the same square as the Maison Blanche Building. He has appraised the Maison Blanche Building on three prior occasions. He has valued easements of various types, including one facade easement and one conservation easement.

On July 27, 2006, Mr. Argote inspected the Maison Blanche Building for purposes of determining the value of the servitude. He produced a report (his direct testimony) valuing the servitude as of the valuation date. To prepare his report, he used legal descriptions and city maps to identify the Maison Blanche

Building.  He relied on an engineer's report to confirm the size of improvements made to the building.  He searched the multiple listing service and courthouse records to locate property sales and leases comparable to the building.  He identified comparable property sales based on date of sale, proximity to the Maison Blanche Building, physical characteristics, and any special conditions of the sale.  To determine the value of the servitude he determined the difference between the value of the Maison Blanche Building before and after the conveyance of the servitude, employing a comparable sales approach.  His report states that it was produced in conformity with the Uniform Standards of Professional Appraisal Practice.

OPINION

I.  Introduction

The principal questions before us are whether the partnership overstated the charitable contribution deduction to which it was entitled for 1997 on account of its making a qualified conservation contribution of the servitude to PRC, a qualified organization, and, if so, the amount, if any, of any resulting accuracy-related penalty.  Before we address those questions, however, we must dispose of petitioner's objections to respondent's expert witness (Mr. Argote) and his direct testimony.

II.  Objection to Mr. Argote's Testimony

A.  Introduction

Petitioner objects to Mr. Argote's direct testimony on the grounds that (1) he is not qualified to testify as an expert witness with respect to "facade donations", and (2) even if he is so qualified, his direct testimony is inadmissible because it is not reliable.

B.  Qualification as an Expert Witness

Proceedings in this Court are conducted in accordance with the Federal Rules of Evidence.  See sec. 7453; Rule 143(a).  Rule 702 of the Federal Rules of Evidence states that one is qualified as an expert witness "by knowledge, skill, experience, training, or education". Respondent offered Mr. Argote as an expert with respect to commercial real estate appraisal, qualified on that basis to testify as to the value of the servitude.  We must determine whether he is so qualified.  "`The essential elements of the real estate expert's competency include his knowledge of the property and of the real estate market in which it is situated, as well as his evaluating skill and experience as an appraiser.'"  Hidden Oaks, Ltd. v. City of Austin, 138 F.3d 1036, 1050 (5th Cir. 1998) (emphasis omitted) (quoting United States v. 60.14 Acres of Land, 362 F.2d 660, 668 (3d Cir. 1966)).

Mr. Argote is a licensed real estate appraiser in Louisiana with over 25 years of experience appraising real estate in the New Orleans area.  He is a member of the Appraisal Institute and possesses its MAI designation.  He has taken many appraisal

courses, and he has presented seminars on commercial real estate appraising.  He has extensive experience appraising buildings used as or to be used as hotels in the New Orleans area. Specifically, he appraised 50 to 70 of those buildings between 1990 and 2000, about 85 percent of which were located in the Vieux Carre or the Central Business District of New Orleans, the neighborhood in which the Maison Blanche Building is located.  He has appraised commercial properties neighboring the Maison Blanche Building.  Moreover, he has appraised the Maison Blanche Building on three prior occasions.  In carrying out his appraisal assignment for respondent, he used information gathered from public records.  Mr. Argote inspected the property and studied the zoning restrictions, plat maps, and an engineer's report to determine a value for the servitude.  He estimated the value of the servitude by employing a comparable sales approach, an approach that Mr. Roddewig also employed and that generally is accepted by courts as the best evidence of value (if comparability can be shown).  E.g., Estate of Jameson v. Commissioner, 267 F.3d 366, 373 (5th Cir. 2001), vacating T.C. Memo. 1993-43; Terrene Invs., Ltd. v. Commissioner, T.C. Memo. 2007-218.

Mr. Argote's experience, skills, approach, and the effort he took to value the Maison Blanche Building place him squarely within the definition of an individual qualified to provide expert appraisal testimony on the value of commercial real estate.  Petitioner argues, however, that Mr. Argote has

insufficient experience with conservation restrictions to be accepted as an expert qualified to testify with respect to the value of the servitude.  We do not agree.

A taxpayer may be entitled to a charitable contribution deduction on account of its contribution of a qualified conservation contribution to a qualified organization.  See sec. 170(f)(3)(B)(iii).  "A qualified conservation contribution is the contribution of a qualified real property interest to a qualified organization exclusively for conservation purposes."  Sec. 1.170A-14(a), Income Tax Regs.  "A perpetual conservation restriction is a qualified real property interest."  Sec. 1.170A-14(b)(2), Income Tax Regs.  "A 'perpetual conservation restriction' is a restriction granted in perpetuity on the use which may be made of real property--including, an easement or other interest in real property that under state law has attributes similar to an easement (e.g., a restrictive covenant or equitable servitude)."  Id.[3]

_____

[3]  The regulations continue:  "For purposes of this section, the terms 'easement', 'conservation restriction', and 'perpetual conservation restriction' have the same meaning."  Sec. 1.170A-14(b)(2), Income Tax Regs.  We shall use the term "conservation restriction" to describe that common meaning.  The servitude is a
                                                    (continued...)

A qualified conservation contribution resulting from the creation of a conservation restriction in favor of a qualified organization may give rise to a charitable contribution deduction if the value of the property burdened by the restriction is diminished on account of the creation of the restriction. The fair market value of a conservation restriction generally cannot be determined by looking to sales of comparable property since a market for the purchase and sale of conservation restrictions rarely exists. Symington v. Commissioner, 87 T.C. 892, 895 (1986). Therefore, a conservation restriction's value is determined by measuring the impact of the restriction on the value of the property affected by the restriction; i.e., the diminution (or enhancement) in value of that property resulting from the creation of the restriction. See sec. 1.170A-14(h)(3)(i) and (ii), Income Tax Regs. The procedure involves determining the difference between the fair market value of the affected property before and after the restriction is imposed. Sec. 1.170A-14(h)(3)(i), Income Tax Regs.; e.g., Thayer v. Commissioner, T.C. Memo. 1977-370. Of that procedure, we have said: "This valuation procedure involves traditional real estate valuation principles, except it is necessary to derive two valuations rather than one." Thayer v. Commissioner, supra. The second valuation may be more difficult than the first because the property is then encumbered by the conservation restriction,

---

[3](...continued)
conservation restriction within that meaning of the term
"conservation restriction".

whose effect on the value of the property may be difficult to judge. Nevertheless, it is common that real estate appraisers value encumbered property (e.g., improved or unimproved realty subject to an easement). By definition, a conservation restriction is an encumbrance on real property. Petitioner has failed to show a categorical difference in the skills necessary to value property encumbered by a conservation restriction as opposed to the skills necessary to value property encumbered by some other restriction or burden. Indeed, petitioner admits on brief that, within the field of real estate appraisal, "there may not be a formal subspeciality of facade donations". Moreover, on past occasions, in determining the value of a conservation restriction, we have accepted the testimony of a real estate appraiser with no prior experience in valuing that type of restriction. Johnston v. Commissioner, T.C. Memo. 1997-475; Losch v. Commissioner, T.C. Memo. 1988-230. Besides, Mr. Argote has valued easements of various types, including one facade easement and one conservation easement. Neither this Court nor the Court of Appeals for the Fifth Circuit, the court to which, barring a stipulation to the contrary, an appeal would lie, see sec. 7482(b)(1)(E), has ever denied expert testimony from an appraiser based on his lack of specific experience with conservation restrictions.

As stated, Mr. Argote is qualified to provide expert appraisal testimony on the value of commercial real estate. The specific subject matter of his direct testimony in this case is

the before restriction and after restriction values of the Maison

Blanche Building.  It is within his qualifications to so testify.

Indeed, considering Mr. Argote's history of valuing hotels in the

Central Business District, and the fact that he has valued the

Maison Blanche Building on three prior occasions, he is perhaps

more familiar with that subject matter than petitioner's expert

witness.

We find respondent's witness, Mr. Argote, eminently well

qualified to give expert testimony as to the value of the

servitude.  Petitioner's objection to the contrary is overruled.

C.  Reliability

1.  Introduction

Petitioner argues that Mr. Argote's direct testimony (i.e.,

his written report) "has numerous and significant deficiencies

* * * [that] render it unreliable and appropriate for exclusion".

Specifically, petitioner criticizes Mr. Argote's direct testimony

for failing to (1) comply with certain provisions of the

Secretary's regulations governing charitable contribution

deductions and (2) conform to the Uniform Standards of

Professional Appraisal Practice.  Reliability is made a

prerequisite to expert testimony by rule 702 of the Federal Rules

of Evidence, which, in pertinent part, provides that a witness

qualified as an expert with respect to scientific, technical, or

other specialized knowledge may provide testimony thereto: "if

(1) the testimony is based upon sufficient facts or data, (2) the

testimony is the product of reliable principles and methods, and

(3) the witness has applied the principles and methods reliably to the facts of the case." Mr. Argote arrived at his opinion as to the value of the servitude by a three-step comparable sales approach: He first determined the value of the Maison Blanche Building unencumbered by the servitude; he then determined its value encumbered by the servitude; lastly, he determined the value of the servitude by calculating the difference (which he found to be zero). Mr. Argote's direct testimony was of a technical nature. See Gross v. Commissioner, T.C. Memo. 1999-254 (finding a discounted cashflow analysis to be a reliable tool to determine the value of a minority stock interest), affd. 272 F.3d 333 (6th Cir. 2001). We therefore must determine the reliability of Mr. Argote's proffered direct testimony. See Fed. R. Evid. 104(a).

2. Qualified Appraisal

Petitioner's first claim is that Mr. Argote's direct testimony is unreliable because it is not a qualified appraisal as defined by section 1.170A-13(c)(3), Income Tax Regs. We can summarily dispose of that claim. Petitioner fails to understand that the requirements of section 1.170A-13(c)(3), Income Tax Regs., are applicable to taxpayers in connection with certain charitable contributions of property. The regulation has no application to an appraisal obtained by respondent in support of litigation.

### 3. Exclusion of the Kress Building

Petitioner argues that Mr. Argote's direct testimony is unreliable because, in valuing the servitude, he failed to take account of the detriment in value to the Kress Building on account of the conveyance of the servitude to PRC, as required by section 1.170A-14(h)(3)(i), Income Tax Regs. In pertinent part, that regulation specifies that the amount of the deduction in the case of a charitable contribution of a conservation restriction covering a portion of contiguous property owned by the donor is the difference between the before and after values of the entire contiguous parcel. The Maison Blanche and Kress Buildings are contiguous, and petitioner believes that the conveyance of the servitude reduced not only the value of the Maison Blanche Building but also the value of the Kress Building. It is respondent's position that the servitude does not burden or affect the Kress Building. Moreover, as evidenced by his direct testimony, the appraisal assignment given Mr. Argote was "[t]o estimate the market value of the facade donation on the subject improvements", which he identifies as "a 13-story retail/office building known as the Maison Blanche Building". Petitioner criticizes Mr. Argote for, in effect, misidentifying the parcel giving rise to petitioner's charitable contribution deduction. Petitioner does not, however, bring into question the reliability of what Mr. Argote did, which was to estimate the change in value of the Maison Blanche Building to the partnership on account of its conveyance of the servitude to PRC. Petitioner may argue

that Mr. Argote's direct testimony provides no basis to support respondent's adjustment to the partnership's charitable contribution deduction, but we shall not exclude that direct testimony as unreliable for failing to take account of any value reduction to the Kress Building. Mr. Argote was not asked by respondent to opine on that issue.

4. Uniform Standards of Professional Appraisal Practice

Uniform Standards of Professional Appraisal Practice (USPAP) are promulgated by the Appraisal Standards Board of The Appraisal Foundation, a nonprofit organization comprising other nonprofit organizations that represent appraisers and users of appraisal services.[4] Petitioner argues that Mr. Argote's direct testimony is unreliable because in various respects it is not in conformance with USPAP. The premise underlying petitioner's argument is that USPAP is the defining standard for an appraiser's reliability. Petitioner claims: "Daubert [v. Merrell Dow Pharmas., Inc., 509 U.S. 579 (1993)] and its progeny mandate that the Argote Appraisal be tested for its compliance with USPAP."[5]

_____

[4] The Appraisal Foundation, Frequently Asked Questions: http://www.appraisalfoundation.org/s_appraisal/doc.asp?CID=9&DID=172 (last visited Oct. 25, 2008).

[5] In Daubert v. Merrell Dow Pharmas., Inc., 509 U.S. 579 (1993), the Supreme Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, and the Court in Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), clarified that that gatekeeper function applies to all expert testimony, not just testimony based in science. Fed. R. Evid. 702 was amended in 2000 in response to

(continued...)

USPAP is widely recognized and accepted as containing standards applicable to the appraisal profession.[6] Adherence to those standards is evidence that the appraiser is applying methods that are generally accepted within the appraisal profession. Therefore, at a minimum, compliance with USPAP is an indication that the appraiser's valuation report is reliable. However, a noncompliant valuation report is not per se unreliable. Full compliance with professional standards is not the sole measure of an expert's reliability.[7]

Petitioner has not cited any authority, nor do we know of any, for the proposition that an appraiser's compliance with USPAP is the sole determining factor as to whether an appraiser's valuation report is reliable. This and other courts have found that an expert's valuation opinion that does not fully comport with USPAP is still admissible although it may or may not be helpful. See Kohler v. Commissioner, T.C. Memo. 2006-152 (expert report not conforming to USPAP considered but given no weight);

---

[5](...continued)
Daubert and the many cases applying it, including Kumho. See Fed. R. Evid. 702 advisory committee's note (2000 amendment), 28 U.S.C. app. at 893-896 (2000).

[6] Many States have incorporated compliance with Uniform Standards of Professional Appraisal Practice into their appraiser licensing requirements. See, e.g., Ill. Admin. Code tit. 68, sec. 1455.240 (2007); Tit. 876 Ind. Admin. Code sec. 3-6-2 (2008); Tit. 22 Tex. Admin. Code Pt. 8, sec. 155.1 (2001).

[7] As professors Saltzburg, Martin, and Capra state: Expert witness testimony can be "reliable even though the expert's methodology is not generally accepted in her field." 3 Saltzburg et al., Federal Rules of Evidence Manual, sec. 702.02[5], at 702-718 (9th ed. 2006).

EPCO, Inc. v. Commissioner, T.C. Memo. 1999-103 (report of expert not familiar with USPAP received into evidence but of little use to Court); Cheatle v. Katz, 2004 WL 906249 (E.D. Pa. 2004) (report of "highly qualified and credible" expert considered although a portion in contravention of USPAP); McKesson Corp. v. Islamic Republic of Iran, 116 F. Supp. 2d 13, 23 n.6 (D.D.C. 2000) (expert's valuation testimony admissible although he conceded that, in performing his valuation, he had violated the ethics rules established in USPAP), affd. in part, revd. in part on other issues and remanded sub nom. McKesson HBOC, Inc. v. Islamic Republic of Iran, 271 F.3d 1101 (D.C. Cir. 2001), vacated in part 320 F.3d 280 (D.C. Cir. 2003). Petitioner essentially asks the Court to supplant its responsibility to assess an expert's reliability with a rigid standard of reliability. Sole reliance on USPAP is a far more inflexible definition of reliability than the definition (depending on "reliable principles and methods") incorporated into rule 702 of the Federal Rules of Evidence. Therefore, we decline to adopt USPAP as the sole standard for reliability of an expert appraiser under rule 702 of the Federal Rules of Evidence.

Mr. Argote arrived at his conclusion as to the value of the servitude by rejecting two approaches to determining that value accepted by Mr. Roddewig, the cost approach and the income approach. He relied exclusively on a comparable sales approach, an approach on which Mr. Roddewig also relied. Like Mr. Roddewig, Mr. Argote relied on a comparison of the before

restriction and after restriction values of the building. Petitioner's catalog of the alleged deficiencies under USPAP in Mr. Argote's direct testimony goes to the "`bases and sources'" of that testimony, see United States v. 14.38 Acres of Land, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting Viterbo v. Dow Chem. Co., 826 F.2d 420, 422 (5th Cir. 1987)), and accordingly, if of any consequence, those alleged deficiencies affect the weight we accord that testimony, see id., not the threshold question of its reliability.

### 5. Conclusion

Mr. Argote's direct testimony is the product of the application of reliable principles and methods of valuation to sufficient facts and data (as we shall discuss). It is admissible as expert testimony pursuant to rule 702 of the Federal Rules of Evidence. Petitioner's objection to the contrary is overruled.

### D. Conclusion

Mr. Argote is accepted as an expert witness with respect to commercial real estate appraisal qualified to testify as to the value of the servitude, and his written report, received into evidence conditionally, is received absolutely.

## III. Expert Testimony as to the Value of the Servitude

### A. Introduction

The parties agree that the partnership is entitled to a charitable contribution deduction for 1997 on account of its making a qualified conservation contribution of the servitude (a

conservation restriction) to PRC. They disagree as to the amount of that deduction because they disagree as to the value of the servitude. Notwithstanding respondent's expert's (Mr. Argote's) opinion that the value of the servitude was zero, respondent does not ask that we find that its value was any less than determined by respondent in his examination and set forth in the notice; viz, $1.15 million.

Section 170 allows for a charitable contribution deduction. In pertinent part, the Secretary's regulations interpreting section 170 provide: "If a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution". Sec. 1.170A-1(c)(1), Income Tax Regs. "The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs. As noted supra in section II.B. of this report, a market for the purchase and sale of conservation restrictions rarely exists, and a conservation restriction's value is determined by measuring the impact of the restriction on the fair market value of the donor's property affected by the restriction; i.e., any diminution in that fair market value resulting from the creation of the restriction.

The parties rely exclusively on their experts to establish the value of the servitude. Each expert arrived at an opinion as

to the fair market value of the servitude by making the before and after comparison contemplated by the regulations. See sec. 1.170A-14(h)(3)(i), Income Tax Regs. Mr. Roddewig (petitioner's expert) determined the requisite before and after values in three different ways. He relied primarily on a cost approach and an income approach, but he also used, in part, a comparable sales approach. He determined that the appropriate parcel of property to value was the Maison Blanche Building, the 1920s and 1950s annexes, and the Kress Building (the Maison Blanche-Kress parcel). He determined the following before and after restriction values:

### Before Restriction Values

| | |
|---|---|
| Cost approach | $43,000,000 |
| Adjusted income approach | 41,000,000 |
| Comparable sales approach | 40,000,000 |

### After Restriction Values

| | |
|---|---|
| Cost approach | $35,500,000 |
| Adjusted income approach | 28,000,000 |
| Comparable sales approach | -- |

He determined no after restriction comparable sales approach value because, although he had found "[a] few sales in New Orleans that were precisely comparable to the * * * [Maison Blanche-Kress parcel] in * * * [its before restriction] condition", he could find no "directly relevant" postrestriction sales. With respect to the relevant weights to be given to the adjusted income and cost approaches, he concluded that, because on the valuation date the Maison Blanche-Kress parcel "was a truly unique property in New Orleans", "significant weight"

should be given to the greater difference between before and
after restriction values determined under the adjusted income
approach.  Taking into account his three approaches, he reached
the following ultimate determinations as to the before and after
restriction values of the Maison Blanche-Kress parcel and the
value of the servitude:

### Value of the Servitude

| | |
|---|---|
| Before restriction value | $41,000,000 |
| After restriction value | 31,000,000 |
| Difference; i.e., fair market value of the servitude | 10,000,000 |

Mr. Argote relied exclusively on a comparable sales
approach.  He concluded that the before restriction value of the
Maison Blanche Building was $10.3 million and the after
restriction value was $10.3 million.  He determined that the
value of the servitude was zero.

The fair market value of property is determined by taking
into account the highest and best use of that property on the
relevant valuation date.  E.g., Stanley Works v. Commissioner, 87
T.C. 389, 400 (1986).  The experts differ on whether the
conveyance changed the highest and best use of the property each
valued.  Mr. Roddewig determined the highest and best use of the
Maison Blanche-Kress parcel before the conveyance was a mixed use
development, including a Ritz-Carlton Hotel with 512 rooms (60 of
them above the Kress Building), an additional all-suites hotel
with approximately 268 rooms, and retail use on the first two
floors and mezzanine of the Maison Blanche Building.  He
determined that the highest and best use of the Maison Blanche-

Kress parcel after the conveyance was different in that: "The opportunity to add up to 60 additional hotel rooms [above the Kress Building] * * * [had] been eliminated." That difference contributed to his conclusion that, under both the cost and income approaches, the fair market value of the Maison Blanche-Kress parcel was reduced on account of the conveyance. Mr. Argote believes the highest and best use of the Maison Blanche Building both before and after the conveyance was use as a hotel (not necessarily a Ritz-Carlton Hotel) with retail space.

We begin with a discussion of the parties' differences as to whether, on account of the conveyance, the highest and best use of the Maison Blanche-Kress parcel changed. We then explain each expert's valuation methods, and we follow with our conclusions as to the persuasiveness of each expert's opinion.

B. Highest and Best Use Considerations

1. Introduction

"The realistic, objective potential uses for property control the valuation thereof." Stanley Works v. Commissioner, supra. The potential uses of the property must have a "reasonable probability", however. Id. at 401. While respondent believes that the possibility that the partnership would add 60 rooms above the Kress Building was too remote and speculative to be taken into account in determining the highest and best use of the Maison Blanche-Kress parcel, respondent's principal argument is that Mr. Roddewig erred in his belief that the conveyance eliminated the possibility of constructing 60 hotel rooms above

the Kress Building.  Whether Mr. Roddewig erred in that belief presents a question of local law.

    2.  Discussion

We have summarized the terms of the conveyance supra, and set it out in full (excluding exhibits) in an appendix. Petitioner contends that the conveyance "prevents * * * [the partnership] from constructing additional floors above the Kress Building and from selling the Kress Building unencumbered". Petitioner describes the conveyance as granting PRC a "servitude of view", which petitioner further describes as "a servitude of the view of [the] Facade, including that visible from and above the former Kress Building side of the Facade."  Petitioner describes the partnership's risk from building above the Kress Building or selling the Kress Building "unencumbered" as the "risk of being sued by the PRC for breach of contract." Petitioner concedes:  "No portion of the protected Facade is actually located on the * * * Kress building, and the definition of 'Improvement' in the * * * [conveyance] does not include the * * * Kress building."  Petitioner maintains, however, that the Maison Blanche and Kress Buildings share a common wall, which is a part of the facade and is included in the term "improvement". Petitioner claims that the servitude "was created in accordance with the express statutory provisions of * * * [La. Rev. Stat. Ann. sec. 9:1252 (1991)]".

La. Rev. Stat. Ann. sec. 9:1252 (1991) provides for the creation of a perpetual real right burdening the whole or any

part of immovable property, including but not limited to its facade, in favor of an entity formed exclusively for certain public purposes.  Pertinent portions of that section are set out in the margin.[8]  A commentator has observed:  "Since facade servitudes and conservation servitudes are usually in favor of an entity rather than an estate, they are properly classified as rights of use rather than predial servitudes."  1 Title, La.

---

[8]  <u>Creation of real right for educational, charitable, or historic purposes</u>

A.  The owner of immovable property may create a perpetual real right burdening the whole or any part thereof of that immovable property, including, but not limited to, the facade, exterior, roof, or front of any improvements thereon to any corporation, trust, community chest, fund, or foundation, organized and operated exclusively for religious, scientific, literary, charitable, educational, or historical purposes, no part of the net earnings of which inure to the benefit of any private shareholder or individual, or to the United States, the state of Louisiana, or any political subdivision of any of the foregoing.  A real right established pursuant hereto may additionally obligate the owner of the immovable property as is necessary to fully execute the rights granted herein.

B.  A real right created pursuant to this Section shall be binding on the grantor, his heirs, successors, assigns, and all subsequent owners of the immovable property, regardless of the fact that the grantee does not own or possess any interest in a neighboring estate or the fact that the real right is granted to the grantee and not to the estate of the grantee, the fact that the real right was not created as a part of a common development or building plan, devised by an ancestor in title of the grantor.

C.  A real right created under the authority of this Section shall be granted by authentic act and shall be effective against third parties when filed for registry in the conveyance records of the parish in which the immovable property is located. Any right or obligation imposed on the owner of the immovable property by the real right created pursuant hereto, including any affirmative obligation established therein, shall be enforceable by the grantee through judicial proceeding by actions for injunctions or damages brought by the grantee.

[La. Rev. Stat. Ann. sec. 9:1252 (1991).]

Prac. Real Est., sec. 3:47 (2d ed. 2007). The Louisiana Civil Code explains with respect to servitudes: "There are two kinds of servitudes: personal servitudes and predial servitudes." La. Civ. Code Ann. art. 533 (1980). "A personal servitude is a charge on a thing for the benefit of a person." Id. art. 534. "A predial servitude is a charge on a servient estate for the benefit of a dominant estate." La. Civ. Code Ann. art. 646 (2008). A right of use is a type of personal servitude. See La. Civ. Code Ann. art. 534 (1980). It "confers in favor of a person a specified use of an estate less than full enjoyment." Id. art. 639.

The point to be taken from this recitation of local law is that La. Rev. Stat. Ann. sec. 9:1252 allows the owner of immovable property to create a right burdening the property in favor of another person. The difficulty with respect to petitioner's argument relying on La. Rev. Stat. Ann. sec. 9:1252 is his concession that the servitude created by the conveyance does not burden the Kress Building, except, perhaps, for the common wall it shares with the Maison Blanche Building. To appreciate that difficulty, we need to understand something more of local law.

Except where the rule is incompatible, a right of use is regulated by application of the rules governing usufruct and predial servitudes. La. Civ. Code Ann. art. 645 (1980). With respect to predial servitudes, La. Civ. Code Ann. art. 730 (2008) provides: "Doubt as to the existence, extent, or manner of

exercise of a predial servitude shall be resolved in favor of the servient estate." Comment (b) accompanying that article observes:

> (b) It is a cardinal rule of interpretation that, in case of doubt, instruments purporting to establish predial servitudes are always interpreted in favor of the owner of the property to be affected. The rule incorporates into Louisiana law the civilian principle that any doubt as to the free use of immovable property must be resolved <u>in favorem libertatis</u>. * * * The Louisiana Supreme Court has repeatedly declared that "servitudes are restraints on the free disposal and use of property, and are not, on that account, entitled to be viewed with favor by the law." <u>Parish v. Municipality No. 2</u>, 8 La. Ann. 145, 147 (1853), cited with approval in <u>Buras Ice Factory, Inc. v. Department of Highways</u>, 235 La. 158, 103 So. 2d 74 (1958). See also <u>McGuffy v. Weil</u>, 240 La. 758, 767, 125 So. 2d 154, 158 (1960): "any doubt as to the interpretation of a servitude encumbering property must be resolved in favor of the property owner". The rule that the proper interpretation of an ambiguous instrument is that which least restricts the ownership of the land has been applied by Louisiana courts in a variety of contexts. See, e.g., <u>Whitehall Oil Co. v. Heard</u>, 197 So. 2d 672 (La. App. 3rd Cir.), writ refused 250 La. 924, 199 So. 2d 923 (1967) (determination of the question whether a landowner created a single servitude over contiguous tracts or a series of multiple interests). [<u>Id.</u> (Revision Comments-1977).]

The Court of Appeal of Louisiana has held that an agreement to establish a servitude that is ambiguous is unenforceable. <u>Exxon Corp. v. Barry</u>, 384 So. 2d 826 (La. Ct. App. 1980).

There is no language in the conveyance that identifies the partnership as the owner of the Kress Building and obligates it, as owner of that building, to preserve a view of the Maison Blanche Building.[9] There is no language in the conveyance that

---

[9] Petitioner has asked us to find that, on Dec. 30, 1997, petitioner established a condominium regime by which the Maison

(continued...)

grants PRC (or anyone else) any use whatsoever of the Kress Building. Indeed, there is no mention whatsoever of the Kress Building in the conveyance. Moreover, as we have discussed, in determining whether an estate is burdened by a servitude, we must resolve doubt in favor of the negative. See La. Civ. Code Ann. art. 730 and discussion of that article supra. On the evidence before us, we find that the conveyance creates no charge on the Kress Building in favor of PRC.[10] Petitioner has therefore failed to prove that, by the conveyance, and pursuant to La. Rev. Stat.

---

[9](...continued)
Blanche Building and the Kress Building were established as one condominium unit. We have not made that finding in part because petitioner concedes that the condominium declaration was recorded on the day following the conveyance. Petitioner's proposed finding, even if supportable, would have little, if any relevance, to the valuation date questions before us.

[10] We note in passing that petitioner's claim that the Maison Blanche and Kress Buildings share a common wall that is a part of the facade and that is included in the term "improvement" may not be to petitioner's advantage. Where a common wall is between two properties, and the owner opens the wall for the admission of light, he may by acquisitive prescription burden the neighboring estate with a servitude of light that includes the right to prevent the neighbor from obstructing the opening. Palomeque v. Prudhomme, 664 So. 2d 88, 91 (La. 1995); see La. Civ. Code Ann. art. 703 (2008). Blueprints of the Maison Blanche Building depict about 120 windows on the common wall that rises above the Kress Building. We assume that they are old and, by acquisitive prescription or otherwise, their existence may, on the valuation date, the date of the conveyance, have burdened the Kress Building with a servitude of light in favor of the Maison Blanche Building. Such a servitude would likely have a negative affect on the highest and best use of the Maison Blanche-Kress parcel since it would appear to deprive the owner of the Kress Building of some freedom to add to the height of that building. Mr. Roddewig did not consider the possibility of a pre-existing servitude that limited the addition of height to the Kress Building, thus, he may have erred in determining that the highest and best use of the Maison Blanche-Kress parcel before the conveyance included 60 hotel rooms above the Kress Building.

Ann. sec. 9:1252, the partnership granted PRC a perpetual real right (servitude) of any extent in the Kress Building. While the partnership may have obligated itself personally to maintain a view of the Maison Blanche Building, petitioner has failed to show how that promise binds anyone who does not undertake it; e.g., a person acquiring ownership of the Kress Building by eminent domain or as a result of the owner of the building's bankruptcy. Petitioner has failed to show that the highest and best use of the Maison Blanche-Kress parcel after the conveyance differed from its highest and best use before the conveyance on account of the conveyance's depriving the partnership of the ability to add 60 hotel rooms above the Kress Building.

### 3. Conclusion

Mr. Roddewig erred in his opinion that the highest and best use of the Maison Blanche-Kress parcel differed after the conveyance on account of the partnership's disability to add 60 hotel rooms above the Kress Building. We shall take that error into account in considering his valuation conclusions.

### C. Cost Approach

#### 1. Introduction

The cost approach to valuing improved real property is based on the principle of substitution. E.g., Talkington v. Commissioner, T.C. Memo. 1998-412:

> The cost approach derives the value of a property by estimating the reproduction or replacement cost of the improvements, deducting therefrom the estimated depreciation, and then adding the market value of the land. This approach estimates value based on the assumption that a prudent person will not pay more for

a property than it would cost to acquire a site and erect a comparable structure (less accrued depreciation) * * *.

##### 2. Before Restriction Reproduction Cost

Mr. Roddewig calculated the before restriction cost to reproduce the Maison Blanche Building shell,[11] the building's annexes, and the Kress Building. He used the Marshall Valuation Service manual, which he described as a commonly used construction cost manual published by Marshall and Swift, for estimating construction costs for excavation and site preparation, the foundation, the frame, the floors, portions of the exterior walls, the basement walls, and the roof structure. For the terra cotta portions of the exterior walls of the Maison Blanche Building, he relied on reproduction cost estimates that he obtained from one or more companies specializing in the manufacture of terra cotta. He estimated those terra cotta portions to cost $42.025 million. Finally, he added other development costs, such as architect and project management fees. He arrived at a total reproduction cost of $54.3 million before depreciation and obsolescence.

To the $54.3 million so determined, he first applied a discount of 20 percent for physical depreciation to arrive at a tentative depreciated reproduction cost. He then applied discounts of 10 and 15 percent for functional obsolescence (due

---

[11] Mr. Roddewig believed that only the basic shell structure of the Maison Blanche Building contributed to its market value on the valuation date since the rehabilitation plan for the building was to remove all interior partitions as well as mechanical and electrical systems.

to the antiquated design of the Maison Blanche Building), and external obsolescence (due to local preservation restrictions), respectively, to arrive at a depreciated reproduction cost of $32.58 million.

His last step was to add the value of the land. He identified six land sales in New Orleans that he considered sales of comparable properties (all involving land sales for hotel construction). He made adjustments for the type of interest conveyed, market conditions, an adjacent purchaser premium in one case, locality, zoning, size, hotel price point, demolition costs, and retail space. The range of adjusted prices he determined for those sales, on a square foot basis, was $65 to $126, and he decided to use $95 per square foot in valuing the land under the Maison Blanche-Kress parcel. Applying that to the parcel's land area of 68,105 square feet, he arrived at a value of $6,469,975 for the land.

He also derived a value for the cost of the land based on the land cost per hotel room constructed (room cost) for his six comparable parcels. He made adjustments for the same factors that he considered in his price per square foot calculations. The range of the room costs was $9,212 to $19,340. He determined that the Maison Blanche-Kress parcel land should be valued on the basis of a room cost of $15,000. He applied that cost to 780 rooms (which included 60 rooms above the Kress Building), and that indicated to him a land value of $11.7 million. Giving more weight to his room cost analysis than his square footage

analysis, he determined a before restriction value for the Maison Blanche-Kress parcel land of $10.5 million.

The following table summarizes the results of Mr. Roddewig's before restriction approach:

### Before Restriction Reproduction Cost

| | |
|---|---|
| Reproduction cost before depreciation and obsolescence | $54,300,000 |
| Less: Physical depreciation (20%) | 10,860,000 |
| Depreciated reproduction cost | 43,440,000 |
| Less: Functional obsolescence (10%) | 4,344,000 |
| External obsolescence (15%) | 6,516,000 |
| Depreciated reproduction cost | 32,580,000 |
| Plus: Value of land | 10,500,000 |
| Total before restriction reproduction cost (rounded) | 43,000,000 |

### 3. After Restriction Reproduction Cost

Mr. Roddewig assumed that the cost to reproduce the Maison Blanche Building shell, the building's annexes, and the Kress Building, before depreciation and obsolescence, did not change on account of the conveyance. He reduced his estimate of physical depreciation from 20 percent to 15 percent because he believed the useful life of the buildings would be greater by 5 years after the conveyance on account of PRC's monitoring and enforcement of the servitude. He did not change his estimate of functional obsolescence. He increased his estimate of external obsolescence from 15 percent to 30 percent.

He reduced his estimate of the cost of land from $10.5 million, before restriction, to $8 million, after restriction, because the conveyance had reduced the partnership's interest in the Maison Blanche-Kress parcel to less than a fee simple

interest and, he believed, the partnership had lost the right to construct 60 rooms above the Kress Building.

The following table summarizes the results of Mr. Roddewig's after restriction approach:

### After Restriction Reproduction Cost

| | |
|---|---:|
| Reproduction cost before depreciation and obsolescence | $54,300,000 |
| Less: Physical depreciation (15%) | 8,145,000 |
| Depreciated reproduction cost | 46,155,000 |
| Less: Functional obsolescence (10%) | 4,615,500 |
| External obsolescence (30%) | 13,846,500 |
| Depreciated reproduction cost | 27,693,000 |
| Plus: Value of land | 8,000,000 |
| Total after restriction reproduction cost (rounded) | 35,500,000 |

### 4. Cost Approach Value

Mr. Roddewig determined the value of the servitude using the cost approach to be $7.5 million, calculated as follows:

### Value of Servitude Determined Using Cost Approach

| | |
|---|---:|
| Before restriction reproduction cost | $43,000,000 |
| Less: After restriction reproduction cost | 35,500,000 |
| Value of servitude | 7,500,000 |

## D. Income Approach

### 1. Introduction

The income approach to valuing real property involves discounting to present value the expected cashflows from the property. E.g., Marine v. Commissioner, 92 T.C. 958, 983 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991). The theory behind the approach is that an investor would be willing to pay no more than the present value of a property's anticipated net income.

## 2.  Before Restriction Income Approach

Mr. Roddewig calculated a before restriction value for the Maison Blanche Building as of December 29, 1997, using the income approach.  He made various assumptions, among which were the following.  The building would be rehabilitated to house a 452-room Ritz-Carlton Hotel.  Construction would commence on January 1, 1998; it would be completed on December 31, 1999, and the hotel would open on January 1, 2000.  The building would be held until the end of 2002 and would then be sold.  Development costs to rehabilitate the building for the operation of the hotel would be $887,938, $22,549,691, and $47,689,058 for 1997, 1998, and 1999, respectively.  Net operating income from operation of the hotel would be $9,262,297, $10,825,659, and $13,149,400 for 2000, 2001, and 2002, respectively.  The selling price of the building at the end of 2002, determined by applying a capitalization rate of 9.5 percent to expected net operating income for 2003 of $12,947,254, would be, rounded, $136.3 million, which, after deducting selling expenses of $3,407,500 (2.5 percent of the selling price), would produce a net selling price of $132,892,500, which, after payment of a $8.95 million developer's note, would leave net sales proceeds of $123,942,500.  All cashflows were discounted at 13 percent, to produce a before restriction net present value of $29,275,863, which he rounded to $29.5 million.

### 3. After Restriction Income Approach

Mr. Roddewig's calculation of an after restriction value using the income approach differed in important particulars from his before restriction approach. He explained those differences as being due to the burden of the servitude. He reduced his estimates of net operating income from operation of the hotel for each of the years 2000 through 2003 on account of increased administrative and general expenses, operations and maintenance expenses, and insurance expenses. The average increase in each of those categories was $197,500, $201,500, and $99,250 for 2000 through 2003, respectively. For each of those years, he further reduced his estimate of net operating income by $370,000 on account of an annual addition to an accounting reserve for the purpose of replacing the Maison Blanche Building's terra cotta facade.

He increased from 2.5 to 2.75 percent his estimate of the cost to sell the building at the end of 2002, which increase he attributed to additional marketing, legal, and administrative expenses. He increased from 9.5 to 10 percent the capitalization rate that he used to determine the selling price of the building, and he increased from 13 to 13.5 percent the rate he used to discount all cashflows, which increases he attributed to the additional risks and uncertainties he believed attended the servitude.

He determined an after restriction net present value of $17,868,456, which he rounded to $18 million.

### 4. Income Approach Value

Using the income approach, Mr. Roddewig determined the value of the servitude to be $11.5 million, calculated as follows:

#### Value of the Servitude Determined Using Income Approach

| | |
|---|---|
| Before restriction net present value | $29,500,000 |
| Less: After restriction net present value | 18,000,000 |
| Value of the servitude | 11,500,000 |

Mr. Roddewig explained that that determination of value was incomplete, however, because it ignored the portions of the Maison Blanche-Kress parcel devoted to retail department store use and to the planned 268-room all-suites hotel (including 41 rooms to be constructed above the existing building).  Because he lacked data as to income and expenses with respect to those uses and therefore could not pursue an income approach with respect to them, he made adjustments to his preliminary calculations using information developed under the cost approach.  That hybrid approach produced the following results:

#### Before Restriction Hybrid Approach

| | |
|---|---|
| Preliminary determination of value | $29,500,000 |
| Plus: Adjustment for department store space (128,463 sq. ft. x $62.65 per sq. ft.) | 8,048,207 |
| Plus: Adjustment for portion of building devoted to all-suites hotel (48,325 sq. ft. x $62.65 per sq. ft.) | 3,027,561 |
| Plus: Adjustment for additional rooms constructed above building (41 rooms x $14,000 per room) | 574,000 |
| Total adjusted value by income approach (rounded) | 41,000,000 |

### After Restriction Hybrid Approach

```
Preliminary determination of value                    $18,000,000
Plus: Adjustment for department store space
  (128,463 sq. ft. x $53.25 per sq. ft.)                6,840,655
Plus: Adjustment for portion of building devoted
  to all-suites hotel (48,325 sq. ft. x $53.25 per
    sq. ft.)                                             2,573,306
Plus: Adjustment for additional rooms constructed
  above building (41 rooms x $12,000 per room)             492,000
    Total adjusted value by income approach (rounded) 28,000,000
```

Mr. Roddewig determined the value of the servitude using the hybrid income approach to be $13 million, calculated as follows:

### Value of Servitude Determined Using Hybrid Income Approach

```
Before restriction reproduction cost       $41,000,000
Less: After restriction reproduction cost   28,000,000
Value of servitude                          13,000,000
```

E.   Comparable Sales Approach

1.   Introduction

Messrs. Roddewig and Argote both employed the comparable sales approach.  Mr. Roddewig employed it only in aid of determining a before restriction value for the Maison Blanche-Kress parcel.  He did not employ it in aid of determining an after restriction value for the parcel because he could find no sales "that were directly comparable."  Mr. Argote employed the comparable sales approach exclusively to determine both the before and after restriction values of the Maison Blanche Building.

The "comparable sales" (or "market data") approach to valuing real property involves gathering information on sales of property similar to the subject property and then comparing and weighing that information to determine a value for the subject

property.  E.g., <u>Estate of Spruill v. Commissioner</u>, 88 T.C. 1197, 1229 n.24 (1987); <u>Estate of Rabe v. Commissioner</u>, T.C. Memo. 1975-26, affd. without published opinion 566 F.2d 1183 (9th Cir. 1977).  The rationale is that the marketplace is the best indicator of value, based on the conflicting interests of many buyers and sellers.  <u>Estate of Rabe v. Commissioner</u>, <u>supra</u>.  That in turn is based on the principle of substitution; i.e., that a prudent man will pay no more for a given property than he would for a similar property.  <u>Id.</u>  One using the comparable sales approach makes adjustments to the sales prices of the comparable properties to reflect differences between the comparables and the subject property being valued.  E.g., <u>Talkington v. Commissioner</u>, T.C. Memo. 1998-412.  "Positive adjustments are made to comparable properties that are inferior in some fashion to the subject property; negative adjustments are made to comparable properties that are superior in some fashion to the subject property."  <u>Id.</u> n.8.

## 2.  Before Restriction Comparable Sales Approach

### a.  Mr. Roddewig's Approach

Mr. Roddewig identified two sets of buildings suitable for his comparable sales approach.  The first set included downtown New Orleans buildings purchased as shells for adaptive reuse as hotels.  He identified five purchases, two of which involved properties that the purchaser combined to form one hotel.  He determined the sales price per square foot of each building and made adjustments to those prices for several major and a few

minor differences to arrive at an adjusted price per square foot for each building.[12]  He made positive adjustments at the rate of 7.5 percent a year to account for appreciation in the New Orleans hotel market from the date of purchase of each comparable to December 1, 1997.  He believed that the location of each of the comparables was inferior to that of the Maison Blanche Building, so he made a positive adjustment to each, ranging from 10 to 25 percent, to account for that difference.  He made positive or negative adjustments to each comparable to reflect the relative burden of zoning and historic designation differences.  He made negative adjustments to several of the comparables for size and configuration differences.  He made a positive adjustment to each comparable ranging from 15 to 60 percent to reflect the higher room rates expected for a Ritz-Carlton Hotel.  Finally, he made a positive adjustment to each comparable of 25 percent to reflect each's lack of retail space.  He calculated the average adjusted price per square foot to be $53.44.

He also determined the sales price per room for each building in the first set and made the same adjustments he made in determining the adjusted price per room, although, without explanation, some of his percentages differed slightly.  He calculated the average adjusted price per room to be $31,263.

---

[12]  The minor adjustments were relatively small and affected only two of the properties.  One is a 10-percent reduction for a sale that involved seller financing and the other is a 10-percent reduction for the property being purchased by the owner of the adjacent property.

The second set of buildings consisted of office buildings outside of New Orleans purchased for conversion to hotel use. He identified seven buildings, four of which were located in Manhattan, one in Boston, another in Washington, D.C., and a final one in Cleveland.  He used those sales to calculate an average adjusted price per square foot and per room.  He made adjustments with respect to the members of the second set similar to the adjustments he made with respect to the members of the first set; however, he applied different percentages.  For the location adjustment, he made negative adjustments to six of the comparables, ranging from 25 to 40 percent, and he made a positive adjustment to one of 45 percent.  He calculated the average price per square foot for the non-New Orleans properties to be $75.42 and the adjusted price per room to be $60,886.

The following table summarizes the average adjusted prices Mr. Roddewig calculated.

Average Adjusted Prices Per Square Foot and Per Room

Set 1: (New Orleans buildings)
| | |
|---|---|
| Adjusted price per sq. ft. | $53.44 |
| Adjusted price per hotel room | 31,263.00 |

Set 2: (buildings in other cities)
| | |
|---|---|
| Adjusted price per sq. ft. | 75.42 |
| Adjusted price per hotel room | 60,886.00 |

Based on those average adjusted prices, he determined that the value of the Maison Blanche-Kress parcel could be determined by assuming a value of $70 per square foot for the existing improvements and $55,000 for each hotel room to be built.  On a square footage basis, assuming that the existing improvements (including the Kress Building) comprised 530,646 square feet, he

determined a value of $37,145,220, and, on a hotel room basis he determined a value of $39.6 million if only 720 rooms were to be built and $42.9 million if 780 rooms were to be built (i.e., including 60 rooms above the Kress Building).  Determining that "[a]nalyzing the comparables based upon a price paid per room results in a more accurate way of comparing the hotel potential" of the comparables to the Maison Blanche-Kress parcel, he concluded the value of the parcel under the comparable sales approach as of December 1997 was $40 million.

b.  <u>Mr. Argote's Approach</u>

Mr. Argote identified nine buildings in New Orleans that he thought comparable to the Maison Blanche Building and that were sold between January 1995 and December 1997.  He determined the sales price per square foot of each building and made adjustments for differences in conditions of sale, time of sale, location, size, and configuration.  He made positive adjustments at the rate of 5 percent a year to account for appreciation in prices paid for New Orleans buildings suitable for conversion to hotels. He made positive adjustments to eight of the buildings, ranging from 5 to 20 percent, to account for what he thought were the inferior locations of those buildings.  He made negative adjustments to all of the buildings, ranging from 5 to 30 percent, to account for the greater size of the Maison Blanche Building (which he viewed as a detriment).  He made positive or negative adjustments to four of the buildings to account for configuration and layout differences.

He calculated the average adjusted price per square foot to be $20.12.  He decided that the value of the Maison Blanche Building should be calculated assuming a value of $20 per square foot.  He assumed the gross building area of the Maison Blanche Building to be 514,697 square feet, which led to his conclusion that the value of the building before the restriction was (rounded) $10.3 million.[13]

### 3. After Restriction Comparable Sales Approach

Only Mr. Argote used the comparable sales approach to determine an after restriction value.  He identified five buildings in New Orleans that he thought comparable to the Maison Blanche Building, were encumbered by facade restrictions, and were sold between December 1991 and December 1997.  He determined the sales price per square foot of each building and made adjustments for differences in conditions of sale, time of sale, location, size, and configuration.  One building was sold by a lender who obtained the property by foreclosure and might have had a strong motivation to sell; on that account, Mr. Argote made a positive adjustment of 30 percent.  He made positive adjustments at the rate of 5 percent a year to account for appreciation in prices paid for New Orleans buildings suitable

---

[13]  Messrs. Roddewig's and Argote's square footage calculations differ in substantial part because Mr. Roddewig included the area of the Kress Building in the area of the property he was valuing and Mr. Argote did not.  If the area of the Kress Building is eliminated from Mr. Roddewig's calculation of the area of the property he was valuing, the resulting area equals 514,436 square feet, not substantially different from the area assumed by Mr. Argote; i.e., 514,697 square feet.

for conversion to hotels.  He made positive adjustments to four of the buildings, ranging from 20 to 30 percent, to account for what he thought were the inferior locations of those buildings. He made negative adjustments to all of the buildings, ranging from 15 to 30 percent, to account for the greater size of the Maison Blanche Building.  He made positive adjustments to two of the buildings, one by 30 percent and the other by 10 percent, to account for configuration and layout differences.

He calculated the average adjusted price per square foot to be $20.75.  He decided that the value of the Maison Blanche Building after the restriction should be calculated assuming a value of $20 per square foot.  He therefore concluded that the value of the Maison Blanche Building after the restriction was the same as its value before the restriction; viz, (rounded) $10.3 million.

### 4.  Comparable Sales Approach Value

Mr. Roddewig did not determine the value of the servitude using the comparable sales approach because he was unable to determine an after restriction value for the property under that approach.  Mr. Argote determined the value of the servitude using the comparable sales approach to be zero because he determined the value of the Maison Blanche Building both before and after the restriction was the same.

IV. <u>Value of the Servitude</u>

A. <u>Introduction</u>

Valuation is not a precise science, and determining the fair market value of property on a given date is a question of fact to be resolved on the basis of the entire record. E.g., <u>Kaplan v. Commissioner</u>, 43 T.C. 663, 665 (1965); <u>Arbini v. Commissioner</u>, T.C. Memo. 2001-141. Expert testimony may assist the Court to understand areas requiring scientific, technical, or other specialized knowledge. See Fed. R. Evid. 702. Of course, we are not bound by the opinion of any expert witness, and we may accept or reject expert testimony in the exercise of our sound judgment. <u>Helvering v. Natl. Grocery Co.</u>, 304 U.S. 282 (1938); <u>Estate of Newhouse v. Commissioner</u>, 94 T.C. 193, 217 (1990). Although we may largely accept the opinion of one party's expert over that of the other party's expert, see <u>Buffalo Tool & Die Manufacturing Co. v. Commissioner</u>, 74 T.C. 441, 452 (1980), we may be selective in determining what portions of each expert's opinion, if any, to accept, <u>Parker v. Commissioner</u>, 86 T.C. 547, 562 (1986). Finally, because valuation necessarily involves an approximation, the figure at which we arrive need not be directly traceable to specific testimony if it is within the range of values that may be properly derived from consideration of all the evidence. E.g., <u>Peracchio v. Commissioner</u>, T.C. Memo. 2003-280.

With those principles in mind, we address the question of the value of the servitude.

B. <u>Cost Approach</u>

1. <u>Introduction</u>

We have in the past questioned the suitability of the reproduction cost approach when applied to value older, historic structures. <u>Dorsey v. Commissioner</u>, T.C. Memo. 1990-242; <u>Losch v. Commissioner</u>, T.C. Memo. 1988-230. For example, reproduction cost is of little assistance if no one would think of reproducing the property. <u>United States v. Toronto, Hamilton & Buffalo Navigation Co.</u>, 338 U.S. 396, 403 (1949). The Maison Blanche Building was built between 1907 and 1909. It is true that the servitude obligates the building's owner to repair the facade and structural elements of the building if they are damaged. In the case of a total loss or destruction of the building, however, the servitude provides: "Owner shall promptly remove all debris and trash and properly maintain the Land. Owner must obtain Donee's written approval of and prior consent to any construction or reconstruction of * * * [the Maison Blanche Building], as provided herein." Petitioner has failed to convince us that, notwithstanding the historic significance of the Maison Blanche Building, the owners of the building would want to, or would be required to, reconstruct that 100-year-old structure if it were destroyed. Moreover, even if an older building would be reconstructed if destroyed, there are reasons why the cost approach is an inappropriate method for valuing older buildings. In <u>Crocker v. Commissioner</u>, T.C. Memo. 1998-204, we said that the

cost method is a poor indicator of value when estimating the value of older, special-purpose buildings, since any estimate of obsolescence (a necessary component of the valuation process) is subjective. In Losch v. Commissioner, supra, we said: "[I]n dealing with an older, historic structure, it is highly questionable whether the replacement cost method can be used to provide meaningful results." Finally, the Court of Appeals for the Fifth Circuit has also raised a cautionary flag with respect to the admissibility of reproduction cost evidence. United States v. Benning Housing Corp., 276 F.2d 248, 250 (5th Cir. 1960) ("absent some special showing, reproduction cost evidence is not admissible in a condemnation proceeding").

While our jurisprudence does not reject the reproduction cost approach altogether, we have considered it an appropriate measure of value only where the taxpayer establishes a probative correlation between such cost and the fair market value of the property. See Crocker v. Commissioner, supra. Generally, as a precondition to using the approach, the taxpayer must show that the property is unusual in nature and other methods of valuation, such as comparable sales or income capitalization, are not applicable. Id. Whether the Maison Blanche Building is unusual or not, petitioner's application of the income approach and comparable sales approach (at least with respect to the before restriction value of the building) would seem to rule out our consideration of the cost approach in this case. While that is a

sufficient basis for us to give no weight to Mr. Roddewig's cost approach testimony, we shall continue our analysis because, in addition, we find his testimony on that subject to be unpersuasive. Therefore, even if there were no other applicable methods of valuation, we would find that petitioner has failed to establish a probative correlation between Mr. Roddewig's estimate of reproduction cost and the fair market value of the Maison Blanche-Kress parcel.

### 2. First Impression

Our first impression of Mr. Roddewig's estimate of a before restriction value of $43 million for the Maison Blanche-Kress parcel is that it defies reason. The partnership paid $6,625,000 for the Maison Blanche Building, $6 million in December 1995 and an additional $625,000 in September 1996 (all of which, for ease of analysis, we shall consider as having been paid in December 1995). It paid $3.4 million for both the Kress Building and the Kress parking garage in October 1997. Petitioner proposes that we find as a fact that the cost of the Kress Building was $1 million, which amount we shall accept for purposes of this analysis. Mr. Roddewig testified that, in September 1999, the partnership paid $3,375,938 to buy out the remaining term of the Maison Blanche Building retail lessee. We shall for this analysis accept that amount as an estimate of the value of the lease to the partnership in September 1999. We shall further assume that (1) the $1 million that the partnership paid for the

Kress Building in 1997 is what it would have paid in December
1995 (although that is contradictory to Mr. Roddewig's testimony
about the direction of real estate prices during that time
period); and (2) the $3,375,938 it paid to buy out the lease is
what it would have paid in December 1995 (although, at that time,
it may have been willing to pay more because of the longer
remaining term of the lease). Thus, altogether, the partnership
can be deemed to have paid $11,000,938 ($6,625,000 + $1,000,000 +
$3,375,938) for the Maison Blanche-Kress parcel in December 1995.
If Mr. Roddewig is correct that, on the valuation date (before
the conveyance), the parcel was worth $43 million, then the
parcel had appreciated in value by 291 percent during the 2 years
between December 1995 and December 1997. While he recites a list
of reasons for the "significant increase in the market value of
the * * * [Maison Blanche Building]", including improvement of
the hotel market in New Orleans and the agreements entered into
by the partnership and Ritz-Carlton Hotel chain, his evaluation
of the real estate market in and around New Orleans indicates no
comparable increase. He describes the single-family housing
market as "growing at a relatively stable pace as of the end of
1997." He describes office market conditions during the 1991
through 1997 period as "generally not good", and he describes the
industrial market as being "in a condition similar to the office
market." He describes the retail vacancy rate as stable between
1994 and 1997, although he reports Rosen Consulting Group as

saying that the downtown retail market "had fared relatively well." He adds: "The retail market as of December of 1997 was expected to remain stable over the next few years". With respect to the hotel market, and in particular with respect to what he describes as the "New Orleans Upscale and Luxury Lodging Market", in which the planned Ritz-Carlton Hotel would compete, he testified: "Overall market supply and demand increased at compound annual rates of 1.9 and 1.8 percent, respectively, from 1995 to 1997." In response to a question from the Court, Mr. Roddewig ascribed some increase in value due to the common ownership of the Maison Blanche and Kress Buildings, but he did not quantify that increase. Simply put, we cannot reconcile Mr. Roddewig's report of a New Orleans real estate market enjoying, at best, stable growth with his explanation of 291-percent appreciation in the value of the Maison Blanche-Kress parcel. We shall continue by examining particular aspects of his cost approach.

### 3. Terra Cotta Cost

Mr. Roddewig has failed to convince us that the reproduction cost of the Maison Blanche Building shell and the Kress Building on the valuation date, before depreciation and obsolescence, was $54.3 million. Of that total estimated cost of reproduction, $42.025 million is attributable to reproducing the terra cotta facade on the Maison Blanche Building. Mr. Roddewig's testimony as to that cost is the only evidence of it in the record. His

testimony is based upon estimates which he obtained from terra cotta industry specialists, rather than from his own experience.[14] The estimated cost is not detailed or broken down, making it impossible for us to know what is and is not included and how the cost was determined. While the terra cotta specialists he relied on may be highly qualified, he has not articulated the facts relied on by, and the reasoning of, those specialists, which prevents us from properly evaluating both their and his conclusions. See Estate of Palmer v. Commissioner, T.C. Memo. 1992-48 (quoting 15 Mertens, Law of Federal Income Taxation, sec.

---

[14] Mr. Roddewig's testimony with respect to how many specialists he relied on is inconsistent. Note 5 to the table in his written report labeled "Segregated Cost Analysis: Before Preservation Easement Maison Blanche Hotel Complex (Ritz-Carlton Hotel)--Building Shell Only--As of December 29, 1997" explains that the terra cotta reproduction cost "has been estimated based on calculations from terra cotta specialists." Note 40 to that written report explains: "The costs used by us to calculate the reproduction cost of the Maison Blanche exterior were determined based upon multiple calls with Mr. Pete Pederson of Gladding McBean terra cotta between February 23 and March 4, 2005." We cannot determine how many terra cotta specialists Mr. Roddewig consulted. We shall continue to use the term "specialists" although we are uncertain as to whether there was one or more.

59.08, at 26 (1989)).[15] The estimated cost of $42.025 million to reproduce the terra cotta portion of the facade is the major element of his reproduction cost estimate. Without adequate support for a terra cotta cost of $42.025 million, we give no weight to his conclusion that the total cost to reproduce the Maison Blanche Building shell and the Kress Building is $54.3 million.

### 4. External Obsolescence

In both his before and after restriction calculations of reproduction cost, Mr. Roddewig deducted an amount to reflect external obsolescence: 15 percent of the before restriction depreciated reproduction cost and 30 percent of the after restriction depreciated reproduction cost ($6,516,000, and $13,846,500, respectively). He described the before restriction external obsolescence as resulting from the designation of the Maison Blanche-Kress parcel as part of the Canal Street Historic

---

[15] 15 Mertens, Law of Federal Income Taxation, sec. 59.08, at 26 (1989):

> A common fallacy in offering opinion evidence is to assume that the opinion is more important than the facts. To have any persuasive force, the opinion should be expressed by a person qualified in background, experience, and intelligence, and having familiarity with the property and the valuation problem involved. It should also refer to all the underlying facts upon which an intelligent judgment of valuation should be based. The facts must corroborate the opinion, or the opinion will be discounted. [Fn. refs. omitted.]

District.  He justified the after transaction increase as follows:

> We concluded earlier that the regulations enforced by the * * * [Central Business District Historic District Landmarks Commission] resulted in external obsolescence of 15%.  Our analysis indicates that the additional restrictions resulting from the operation of the preservation and conservation easement add an additional layer of restriction at least as severe as those imposed by the New Orleans historic district regulations.  It is appropriate, therefore, to deduct an additional 15% for the external obsolescence created by the easement, an amount of external obsolescence equal to that also created by regulation of the Maison Blanche and Kress buildings by the * * * [Central Business District Historic District Landmarks Commission].  The result is total external obsolescence "after" considering the easement of 30% compared to only 15% "before" the easement was imposed.

In his oral testimony, Mr. Roddewig explained his adjustments for external obsolescence as being based on his experience and on market data indicating that some buyers reject buildings burdened by preservation easements.  Some adjustment is plausible.  He further testified that he arrived at his percentage adjustments as a matter of judgment.  What is important here is not Mr. Roddewig's application of a 15-percent adjustment both before and after the restriction for external obsolescence on account of historic district regulations.  By itself, that adjustment does not contribute to the value of the servitude.  What is important is his failure to provide us with anything beyond a request to trust in his judgment that the enforcement of the provisions of the servitude doubles the cost of external obsolescence.  As illustrated by our discussion supra of our first impression, Mr.

Roddewig has failed to engender in us full confidence in his judgment. Moreover: "We need not rely on the unsupported opinion of an expert witness." <u>Holman v. Commissioner</u>, 130 T.C. 170, 213 (2008).

   5. <u>Land Value</u>

  In moving from his before to after restriction value, Mr. Roddewig reduced his estimate of the cost of land by $2.5 million because the conveyance had reduced the partnership's interest in the Maison Blanche-Kress parcel to less than a fee simple interest and, he believed, the partnership had lost the right to construct 60 rooms above the Kress Building. We have already, <u>supra</u>, in section III.B.2. of this report, described our reasons for disagreeing with his second conclusion. While Mr. Roddewig may be right that, after the conveyance, the partnership held less than a fee simple interest in the Maison Blanche-Kress parcel, we reject the translation of that conclusion into a 10-percent negative adjustment to the prices of his six comparable parcels. Mr. Roddewig testified that he was unable to find any sale of land in New Orleans encumbered by a preservation easement. As a result, to determine the after restriction land cost component of his reproduction cost analysis, he considered the same six sales he utilized earlier but he "adjust[ed] each comparable downward by 10% to account for the decrease in the property interest resulting from the imposition of the * * * [servitude]." The question before us is whether a servitude

requiring maintenance of a building's facade would survive and affect the value of the underlying land if that land were wiped clean of the building.  While for the sake of argument we will concede that possibility, Mr. Roddewig's conclusion of a 10-percent reduction in value as a general rule is not persuasive, and we do not accept it.  See Holman v. Commissioner, supra at 213.

### 6.  Conclusion

Mr. Roddewig has failed to persuade us that $43 million and $35.5 million are reliable estimates of the before and after restriction reproduction costs of the Maison Blanche-Kress parcel or that the resulting value of the servitude is $7.5 million.  We shall disregard petitioner's cost approach in determining the value of the servitude.

### C.  Income Approach

#### 1.  Introduction

The income approach to valuation is a recognized method that has been favored where comparable market sales were lacking.  See Chertkof v. Commissioner, 72 T.C. 1113, 1122 (1979), affd. 649 F.2d 264 (4th Cir. 1981); Gottlieb v. Commissioner, T.C. Memo. 1974-178.  The usefulness of the income approach diminishes, however, as the quality of the evidence of the income- producing potential of the property (usually evidence of its past performance) diminishes.  It has been judged an unsatisfactory valuation method for property that does not have a track record

of earnings. See <u>Duncan Indus., Inc. v. Commissioner</u>, 73 T.C. 266, 280 n.13 (1979); <u>Pittsburgh Terminal Corp. v. Commissioner</u>, 60 T.C. 80, 89 (1973), affd. without published opinion 500 F.2d 1400 (3d Cir. 1974); <u>Sec. Mortgage Co. v. Commissioner</u>, 58 T.C. 667, 675 (1972). In the absence of that track record, the appraiser has no alternative to using data from similar properties or estimates of the property's income-producing potential, which may reduce the reliability of his conclusions. See <u>Ambassador Apartments, Inc. v. Commissioner</u>, 50 T.C. 236, 243 (1968) ("a computation based on the actual income and expenses of the property to be valued [an apartment building] is more reliable" than a computation based on "income and expense figures ascertained from comparable apartments in the * * * vicinity"), affd. 406 F.2d 288 (2d Cir. 1969). The weakness of the income approach is the many judgment calls often required in its application. See <u>Estate of Berg v. Commissioner</u>, T.C. Memo. 1991-279 ("The principal weakness of the Income Approach is that the value estimate can be easily distorted by the use of inappropriate or incorrect income figures, expense figures, and capitalization rates."), affd. in part, revd. in part on another issue and remanded 976 F.2d 1163 (8th Cir. 1992).

### 2. <u>Mr. Argote's Opinion</u>

Mr. Argote did not use the income approach. He testified that, as applied to the Maison Blanche Building, the income approach relied upon too many assumptions, thus making it prone

to error.  He believes that even a small change in estimated construction costs, the timing of those costs, the length of time to complete construction, estimated income, estimated expenses, capitalization rate, or discount rate could substantially affect the present value arrived at using a discounted cashflow analysis.

### 3.  Discussion and Conclusion

Mr. Roddewig did use the income approach, but he did not rely on the Maison Blanche Building's track record because he took it as a fact that the building would be rehabilitated to house a 452-room Ritz-Carlton Hotel.  He assumed a construction period from 1997 through 1999, and he further assumed the development costs incurred in each of those years.  He assumed what the net operating income of the hotel would be for 2000 through 2002, and he assumed the amount that the building would fetch if sold at the end of 2002.  Based on those assumptions and an assumption as to an appropriate discount rate, he determined that "the most probable price that a purchaser would be willing to pay for the unrehabilitated * * * [Maison Blanche-Kress parcel] prior to considering the impact of the * * * [servitude]" was $29.5 million.  Making some adjustments to his assumptions, he determined an after restriction value of approximately $18 million, which led to his assigning to the servitude a value of $11.5 million.

There are obvious risks of error in the assumptions Mr. Roddewig made: e.g., the hotel might not be finished on schedule;[16] occupancy might be less than expected; the hotel might not fetch $123,942,500 at the end of 2002 (ignoring the servitude). Moreover, in estimating construction costs and hotel receipts and costs alone, Mr. Roddewig made hundreds of assumptions, involving amounts both large ($9,904,936 in construction period interest) and small ($4.50-a-night telephone revenue from occupied rooms), each carrying with it some risk of error. He has provided us with no measure of the overall risk of error in his assumptions. Our own calculations, set forth infra, show that relatively minor changes in only a few of his assumptions would have large bottom-line effects. We agree with Mr. Argote that the many assumptions made by Mr. Roddewig make his conclusions prone to error, and, without some estimate of the risk of error in his assumptions, we are reluctant to accept those conclusions at face value. Moreover, an important reason for his income analysis is to show the loss in value brought about by the conveyance of the servitude. We have specific concerns about some of the assumptions he made in determining a

---

[16] And apparently it was not finished on schedule. Mr. Roddewig assumed that construction would end on Dec. 31, 1999, and the hotel would open the next day, Jan. 1, 2000. Petitioner makes no objection to respondent's proposed finding of fact that the hotel commenced operations on Oct. 6, 2000, and we have so found.

lower value for the Maison Blanche-Kress parcel after the conveyance of the servitude.

Mr. Roddewig increased his estimate of operating expenses to reflect (1) increased administrative costs on account of dealing with PRC, (2) increased maintenance costs for the protected part of the Maison Blanche Building, (3) increased insurance costs for "reproduction insurance", and (4) annual additions of $370,000 to a "facade replacement reserve". Mr. Roddewig estimated the cost of replacing the facade to be $46,719,755, of which the cost of terra cotta would be $42,025,000. We have already expressed our doubts as to that latter amount. See supra section IV.B.3. of this report. We express further doubt as to other components of the facade replacement cost that are not adequately explained, including an almost $3 million architect's fee, approximately $4 million for a development fee, interest, real estate taxes, "Etc.", a project management fee of approximately $2.6 million, and a financing fee of approximately $4.7 million. Mr. Roddewig also offers little support for the amounts he estimates as increased administrative, maintenance, and insurance costs.

In determining an after restriction value, Mr. Roddewig also increased the capitalization rate he used in determining the selling price of the building in 2002 from 9.5 to 10 percent, and he increased the interest rate used to discount all cashflows from 13 to 13.5 percent. He explained those adjustments as resulting from the additional risks and uncertainties attendant

on owing a building subject to a preservation easement.  As examples of those risks he identified the risk that, on account of the servitude, the rehabilitation cost of the Maison Blanche Building for hotel use would increase and, in particular, that the reproduction cost of the terra cotta facade would increase. He made no attempt to quantify the influence of the various risks he identified on the two rates, nor did he explain why overall rehabilitation costs and terra cotta costs were risky enough to contribute to rate changes but safe enough to accept without reservation in calculating the development costs and the additions to the facade replacement reserve included in his after restriction analysis.  If we reduce his 0.5-percent increase in both the capitalization and discount rates by 0.1 percent (a 20-percent reduction), the value that he calculated for the servitude would be reduced by close to $1 million.[17]  Mr. Roddewig has offered an inadequate explanation of why any after restriction increase in risk justifies a rate change of 0.5 percent.

---

[17]  We illustrate the effects of a 0.1- and a 0.2-percent change in the capitalization and discount rates:

| | Capitalization Rate After Restriction | Discount Rate After Restriction | Value of Servitude |
|---|---|---|---|
| As assumed by Mr. Roddewig | 10.0% | 13.5% | $11,407,407 |
| 0.1 % adjustment | 9.9 | 13.4 | 10,534,740 |
| 0.2 % adjustment | 9.8 | 13.3 | 9,649,088 |

The risk of error inherent in the income approach as applied by Mr. Roddewig in this case, together with the fact that we have reliable alternative evidence of value arrived at by the comparable sales approach, is sufficient grounds for us to reject the income approach, and we do.[18]

D. Comparable Sales Approach

1. Introduction

We have found the comparable sales approach to be the most reliable indicator of value when there is sufficient data about sales of properties similar to the subject property. See, e.g., Estate of Spruill v. Commissioner, 88 T.C. at 1229 n.24; Estate of Rabe v. Commissioner, T.C. Memo. 1975-26.

2. Discussion

a. Introduction

As we reported supra in section III.E.1. of this report, Mr. Roddewig employed the comparable sales approach only in aid of determining a before restriction value for the Maison Blanche-Kress parcel, while Mr. Argote employed it as his exclusive approach to determine both the before and after restriction value of the Maison Blanche Building.

_____

[18] Because we give no weight to the income approach, we need not decide the parties' disagreement over whether it is appropriate to use the financial results of operating the hotel in determining the fair market value of the Maison Blanche Building.

b.  Mr. Roddewig's Use of Nonlocal Comparables

Mr. Roddewig identified two sets of building sales he believed were suitable for comparison to the Maison Blanche Building.  One set comprised downtown New Orleans buildings purchased as shells for adaptive use as hotels.  The second set comprised office buildings outside of New Orleans purchased for the same purpose.  Mr. Roddewig explained that he had a need for nonlocal comparables because none of the buildings that he found in downtown New Orleans were similar to the Maison Blanche-Kress parcel in size, luxury, or hotel market orientation.  He added: "Buildings purchased for rehabilitation into first class luxury hotels trade in a national marketplace, so it is appropriate to analyze sales in other cities for purposes of establishing the value of the Maison Blanche Hotel Complex by the Sales Comparison Approach."

Mr. Argote disagreed on the need for nonlocal comparables. While he agreed that, on occasion, an appraiser has to look outside the location of the subject property for comparables, "particularly when there are no sales available", he was of the opinion that, "in the New Orleans market at that point in time, there were at least nine sales that he [Mr. Roddewig] could have used, and he did not do that."

In determining the fair market value of property under the comparable sales approach, we have preferred evidence of local

sales.[19] The reason is simply that location plays a huge role in determining the desirability, and, thus, the value of real estate.[20] We reduce substantially the risk of error in employing the comparable sales approach if, on account of proximity, we can eliminate (or reduce the significance of) location as a distinguishing factor. Indeed, Mr. Roddewig testified that more weight should be given to local sales, but that the adjusted values for those sales should be considered in light of the higher adjusted values he determined for his nonlocal sales. The adjusted values he determined for his nonlocal sales were

---

[19] See, e.g., Garwood Irrigation Co. v. Commissioner, T.C. Memo. 2004-195 (rejecting use of comparable property located in a different market than subject property); Borgatello v. Commissioner, T.C. Memo. 2000-264 (declining to place weight on comparable properties located in other communities); Eugene D. Lanier, Inc. v. Commissioner, T.C. Memo. 1998-7 (disregarding comparable properties located in other cities without evidence that these markets were similar to subject property market); Estate of Hillebrandt v. Commissioner, T.C. Memo. 1986-560 (placing little to no weight on appraiser's use of comparable located farther from subject property where closer comparable properties existed); Marks v. Commissioner, T.C. Memo. 1985-179 (relying on value of properties in closer proximity to subject property); Kewaunee Engg. Corp. v. Commissioner, T.C. Memo. 1979-154 (finding properties within close proximity to subject property more persuasive of value).

[20] Location is said to have been the motto of the hotelier Conrad Hilton:

> The late Conrad Hilton who built a chain of hotels across the world, was firmly of the belief that if he built a hotel in the right location it would make money. Location, Location, Location was his motto. Never build a hotel where there is no traffic. [Ferrers, "In a Town Called Google, the Keyword is Real Estate", Smart News Direct, http://www.smartnewsdirect.com/realestate/inatown.html (last visited Oct. 25, 2008).]

significantly higher than the adjusted values he determined for his local sales: 64 percent higher on a square footage basis and at least double on a per-room basis.[21]  Those large disparities in values convince us that the risk of using nonlocal sales is significant.  Moreover, Mr. Roddewig did not claim that there were no local sales of comparable properties available; he identified five, and Mr. Argote was of the opinion that there were nine that he should have considered.  Nor are we convinced that it was appropriate to take nonlocal sales into account because of his claim that buildings purchased for rehabilitation into first class luxury hotels trade in a national marketplace. He had no statistics supporting that claim, nor did he have evidence of any competition for the Maison Blanche Building, which, 2 years before the valuation date, was purchased for the relatively moderate price of $6.625 million.[22]

Mr. Roddewig has failed to convince us that we should give weight to his nonlocal sales, and we shall not.

---

[21]  He reports an approximate mean per square foot value for local comparables of $53 and an approximate mean per square foot value for nonlocal comparables, after excluding outliers, of $87 a square foot.  He reports an approximate mean per hotel room for local comparables of $31,000 and, after eliminating outliers, a range of per-room values for nonlocal comparables from $66,000 to $90,000.

[22]  On brief, in support of Mr. Roddewig's use of nonlocal sales, petitioner cites several publications that are not in evidence and State court authority.  At most, the conclusion that can be drawn from those materials is that there is no absolute bar to considering sales of comparable nonlocal property transactions, a point with which we agree.

c.  His Use of Price Per Room

For each of his comparable sales, Mr. Roddewig determined an adjusted sales price on the basis of both dollars paid per square foot and dollars paid per hotel room.  On the valuation date, the Maison Blanche Building was a partially vacant building that the partnership planned to rehabilitate and operate as, among other things, two hotels with 720 rooms.  Because those rooms had not yet been constructed, that quantity is somewhat speculative.  The square footage of the building was a determinable quantity.  All other things being equal Mr. Roddewig's determination of the value of the Maison Blanche Building on the basis of a per hotel room basis is less certain than his determination of that value on the basis of a per square foot basis.  The parties disagree on whether it is appropriate to use sales of existing hotel properties in valuing a vacant retail and office building only intended for hotel use and whether petitioner has established that price per room is a method of valuation employed by buyers and sellers in New Orleans or any other relevant market.  We are inclined to agree with respondent that Mr. Roddewig's price-per-room analysis should be rejected, but, because we shall consider only Mr. Roddewig's analysis based on local sales, and, on that basis, his per-room analysis produces a lower value for the Maison Blanche Building than does his per square foot analysis,

we shall assume that petitioner would abandon his per-room analysis.[23]   In any event, we shall disregard it.

### d.   The Experts' Adjustments

Both Messrs. Roddewig and Argote adjusted the sales prices of their comparables for conditions of sale, time of sale, size of the comparable, and configuration of the property.  Mr. Roddewig also made substantial adjustments for the higher room rates expected at a Ritz-Carlton Hotel (hotel price point adjustment), the lack of retail potential in each comparable (retail-potential adjustment), and zoning and historic designation differences (zoning/historic district adjustment). He offered the following explanation for the hotel price point adjustments (a positive adjustment in each case, ranging from 15 to 60 percent):  "Luxury hotel development projects generate the highest room rates and typically pay more per square foot or per room to acquire buildings for luxury hotel development projects." When asked by the Court if a luxury hotel developer would pay more for a piece of property than the local market would demand, Mr. Roddewig answered in the affirmative:

> There are particular types of buyers that will pay a
> premium without trying to think about what the local

_____

[23]   Mr. Roddewig reports a mean average adjusted price per square foot of $53.44 for his local comparables and 530,646 square feet in the Maison Blanche-Kress parcel, which indicates a before restriction value, on a square foot basis, of $28,124,238. He also reports a mean average adjusted price per room of $31,263 for his local comparables and 720 planned rooms, which indicates a before restriction value, on a per-hotel-room basis, of $22,509,360.

> buyers will pay.  They have their own criteria for
> rates of return, and they don't price it based on what
> their competition in the local market is willing to pay
> and go a dollar more.

The hotel price point adjustments Mr. Roddewig made are not of little consequence.  If we eliminate them from his calculations, the average price per square foot that he calculated for the local comparables drops from $53.44 to $44.03 per square foot (a difference of $9.41).  Given his estimate of 530,646 square feet in the Maison Blanche-Kress parcel, that means that the indicated value of the parcel based on the local comparables would be $23,371,242 rather than $28,357,722, a difference of $4,986,480.  That is a large amount of money for a luxury hotel developer to leave on the table by ignoring local market conditions in buying a parcel like the Maison Blanche-Kress parcel.  Without evidence of the phenomenon more convincing than Mr. Roddewig's testimony, we will not take the risk of inaccuracy that those adjustments carry.

Mr. Roddewig also made retail-potential adjustments of 25 percent to four of his local comparables and 35 percent to the fifth (the additional 10 percent to account for an interior lot with limited visibility).  All of the adjustments were positive. He explained the 25-percent adjustments as being necessary because about 25 percent of the Maison Blanche-Kress Complex was to be devoted to "a retail department store".  Mr. Argote testified that, since retail use is only 25 percent of the intended use of the Maison Blanche-Kress parcel, making a 25-

percent positive adjustment to the sales prices of the comparables is the equivalent of saying that space devoted to retail is worth twice the space devoted to other uses. He further testified that putting a premium on the value of retail space was unjustified because of the poor climate for retail operations in the downtown area. He testified that the major retailers had left or were in the process of leaving the downtown New Orleans area. He is of the opinion that, in late 1997, an attempt to combine a retail operation with a hotel would have been risky, and the combined operation would have been worth less than a hotel operation alone. Indeed, on cross-examination, Mr. Roddewig agreed that, for most buildings on Canal Street in 1997, the retail market "was probably not good." Mr. Argote is more familiar with the New Orleans real estate market than is Mr. Roddewig, and his superior knowledge of the market and his demeanor give us confidence in his testimony. We accept his opinions that no premium should attach to the value of retail space and no positive adjustment is required. We shall make no retail-potential adjustments.

Mr. Roddewig also made zoning/historic district adjustments. Such adjustments are proper. See, e.g., Mathis v. Commissioner, T.C. Memo. 1989-254 (taxpayer's expert erred in not making a downward adjustment to reflect the zoning of the subject property). We accept his inclusion of zoning adjustments, which varied depending on the zoning classification of the building

compared to the zoning classification of the Maison Blanche Building. We also accept his argument that historic districts and landmark designations, like zoning restrictions, limit the ability to develop property; thereby, decreasing its value. He made negative adjustments of 5 percent to two of his local comparable sales to reflect that they are not landmark properties or within New Orleans historic districts. Under his cost approach, he made a negative adjustment of 15 percent to account for external obsolescence resulting from the designation of the Maison Blanche Building as part of the Canal Street Historic District. We think he has been inconsistent. We will use 10 percent.

### e. Before Restriction Value

#### (i) Introduction

Mr. Roddewig relies on five local comparables; Mr. Argote relies on nine; four are common to both appraisers. We shall rely on those four to determine the before restriction value of the Maison Blanche Building under the comparable sales approach. We shall first determine the average adjusted price per square foot for those four comparables. We shall then extrapolate from that price to determine the before restriction value of the Maison Blanche Building. We shall disregard the Kress Building in our calculations because Mr. Roddewig erred in believing that it was burdened by the servitude. We shall average Messrs. Roddewig's and Argote's estimates of the area of the Maison

Blanche Building, 514,436 and 514,697 square feet, respectively, and assume that the result, 514,566 square feet, is the area of the Maison Blanche Building.

### (ii)  The Pere Marquette Building

One common property is the Pere Marquette Building, 150 Baronne Street, New Orleans, Louisiana.  It is located about one block from the Maison Blanche Building.  Messrs. Roddewig and Argote agree that the Maison Blanche Building is in a superior location due to its proximity to the French Quarter.  Each made a positive adjustment to the sales price of the Pere Marquette Building of 20 percent to account for the Maison Blanche Building's superior location.  We agree with that adjustment.

The experts differ by a few dollars on the sales price of the Pere Marquette Building, which we find to be $5.5 million. As to the time of the sale, Mr. Roddewig says on one page of his report that the building sold in January 1996 and on another that it sold in June 1992.  Mr. Argote says that it sold on January 26, 1996.  We accept Mr. Argote's date and his positive adjustment of 10 percent for the time difference from the sale to the valuation date.

Both appraisers made a negative adjustment of 5 percent on account of the size of the Pere Marquette Building.  Mr. Roddewig offered the following general rule:  "Larger buildings often sell for less per square foot than do smaller buildings.  Typically, this is caused by the fact that larger buildings, like larger

sites, may take longer to develop, and therefore involve more risk than smaller buildings or sites." We agree that, on the record before us, a 5-percent size adjustment is appropriate.

Mr. Roddewig made a negative adjustment of 10 percent to account for the more favorable zoning classification of the Pere Marquette Building compared to the Maison Blanche Building and its lack of local landmark designation. We adjust that negative adjustment to 15 percent to account for a 10-percent (not 5-percent) adjustment for lack of local landmark status.

Lastly, Mr. Roddewig made a negative adjustment of 10 percent under the heading "Adjustment for Property Interest Conveyed and Conditions of Sale", which adjustment he explained was due to seller financing. Because Mr. Argote makes no similar adjustment, and Mr. Roddewig failed to set forth sufficient facts about the financing for us to determine whether any adjustment is warranted, we will make none.

Mr. Roddewig makes no mention of a garage attached to the Pere Marquette Building. Mr. Argote testified that, along with the building, the purchasers of the property acquired a six-story, 60,574-square-foot parking garage attached to the building. Given Mr. Argote's greater experience in the New Orleans real estate market, we shall assume that a parking garage did come with the Pere Marquette Building. Mr. Argote allocated a $2 million portion of the $5.5 million purchase price to the parking garage and took account only of the remaining portion

($3.5 million) in determining the price per square foot of the Pere Marquette Building. Mr. Argote was right to disregard the portion of the purchase price allocable to the garage since the subject property, the Maison Blanche Building, was being valued without regard to any garage space. We have no basis to challenge his allocation of $2 million to the parking garage and, based on our confidence in him, we shall accept it. The parties agree that the size of the Pere Marquette Building is 202,000 square feet. Assuming the cost of the building to be $3.5 million, that results in an unadjusted price per square foot of $17.33 for the Pere Marquette Building, which we accept.

We determine an adjusted price per square foot for the Pere Marquette Building, as follows:

<u>Adjusted Price per Square Foot: Pere Marquette Building</u>

| | | |
|---|---|---|
| Unadjusted price per square foot | | $17.33 |
| Adjustments: | | |
|   Location | +20% | |
|   Time | +10% | |
|   Size | - 5% | |
|   Zoning/historic | <u>-15%</u> | |
| Total adjustments | +10% | |
| Multiplier (100% + 10% = 110%) | | x  <u>110%</u> |
| Adjusted price per square foot | | 19.06 |

(iii)  <u>The Bell South Building</u>

A second common property is the Bell South Building, 820 Poydras Street, New Orleans, Louisiana. The experts agree that it sold for $2.657 million in 1997. Mr. Roddewig testified that it sold in May 1997 and Mr. Argote testified that it sold on December 18, 1997. Mr. Argote provided more details surrounding

the sale, so we accept his date of sale, and we will not adjust for time.

Both appraisers made negative adjustments for the building's size, 15 percent by Mr. Argote and 10 percent by Mr. Roddewig. Mr. Argote is of the opinion that the building includes "+/- 77,000 square feet", while Mr. Roddewig is of the opinion that it includes 73,347 square feet. We shall accept Mr. Roddewig's more exact figure. Neither appraiser gave a reason for the level of adjustment he chose to apply on account of size. In reviewing the adjustments that Mr. Roddewig applied to his comparable sales, no pattern emerges as to his adjustment for building size. There is a pattern to Mr. Argote's adjustments that reflects the size of each comparable property sale he chose. That pattern gives us confidence in Mr. Argote's adjustments, and we shall accept his negative adjustment of 15 percent for the size of the building.[24]

The Bell South Building has the same zoning classification as the Pere Marquette Building and, like that building, has not been designated a local landmark. Mr. Roddewig increased his negative adjustment to account for zoning/historic designation differences from the Maison Blanche Building by 10 percentage points (-20 percent for the Bell South Building compared to -10

_____

[24] We do so notwithstanding that we accept Mr. Roddewig's smaller estimate of the size of the building. That is because Mr. Argote applied the same negative 15-percent size adjustment to two smaller buildings that comprised 61,000 and 61,130 square feet, respectively.

percent for the Pere Marquette Building), however, to account for his opinion that the site of the Bell South Building was not developed to its full potential.  While that may be so (although Mr. Roddewig fails to mention a 17,600-square-foot parking lot adjacent to the Bell South Building that Mr. Argote testified was part of the sale), he has not explained how he arrived at that 10-percentage-point adjustment.  We shall make a negative adjustment of 15 percent on account of zoning/historic designation, equal to the adjustment we make with respect to the Pere Marquette Building.

Both appraisers made positive adjustments on account of location, but those adjustments differed substantially in size, 25 percent for Mr. Roddewig and 5 percent for Mr. Argote.  We find neither wholly persuasive.  Mr. Roddewig's 25-percent adjustment is the largest location adjustment that either appraiser used for any local property, and Mr. Argote's 5-percent adjustment is the smallest.  Mr. Argote adjusted all but one of his other comparables upward by 20 percent for location differences.  He did not explain why the Bell South Building warrants a much smaller adjustment.  Mr. Roddewig described the Bell South Building's location as "closer to [the] convention center, but considerably further from [the] French Quarter".  He used the same language to describe another comparable's location, but he adjusted that property by 20 percent for location.  We shall make a positive adjustment of 20 percent for location.

Finally, we must address Mr. Argote's 20-percent negative adjustment under the heading "Configuration/Layout" to account for a 17,600-square-foot parking lot that he believes the purchasers of the Bell South Building acquired along with the building.  Mr. Roddewig recognized that the building does not cover the entire lot, but he mentions no parking lot. Petitioners make no objection to Mr. Argote's inclusion of the parking lot in the purchase, and we shall accept it, along with Mr. Argote's adjustment.  We shall make a negative adjustment of 20 percent for configuration/layout.

Assuming the cost of the building to be $2.675 million and it to include 73,347 square feet, the unadjusted price per square foot for the Bell South Building is $36.47, which we accept.

We determine an adjusted price per square foot for the Bell South Building, as follows:

<u>Adjusted Price per Square Foot: Bell South Building</u>

| | | |
|---|---|---|
| Unadjusted price per square foot | | $36.47 |
| Adjustments: | | |
|   Size | -15% | |
|   Zoning/historic | -15% | |
|   Location | +20% | |
|   Configuration/layout | <u>-20%</u> | |
| Total adjustments | -30% | |
| Multiplier (100% - 30% = 70%) | | x<u>   70%</u> |
| Adjusted price per square foot | | 25.53 |

(iv)  <u>Magazine Street and Board of Trade Place</u>

The last two properties that both appraisers relied upon are actually two neighboring properties that were purchased by the same buyer and combined to form one hotel.  The properties are

located at 332-36 Magazine Street (Magazine Street) and 320 Board of Trade Place (BT Place), New Orleans, Louisiana. Magazine Street was purchased on July 2, 1997, and BT Place was purchased on October 24, 1997. Otherwise, the properties have very similar characteristics. Therefore, we will consider them together.

Taking account of the testimony of both experts, the two buildings comprise 43,500 square feet, and they sold for a combined price of $1.235 million. The unadjusted price per square foot of the combined buildings is $28.39. Mr. Roddewig made no adjustment for size; Mr. Argote made a negative adjustment of 25 percent. Mr. Roddewig justified an exception from the general rule that small buildings often sell for more per square foot than larger on the basis that the small number of rooms, 86, in the combined buildings and their inefficient layout offset the potentially higher price that otherwise would be paid for a smaller building. He did not explain why a zero-percent adjustment as opposed, say, to a negative adjustment of 10 percent is appropriate. We have no independent basis to determine the appropriate size adjustment for this comparable. We shall rely on our general confidence in Mr. Argote and the pattern we discern in his size adjustments to accept his negative adjustment of 25 percent.

Mr. Roddewig made a positive adjustment of 15 percent to account for zoning and historic designation factors. He described the adjustment of consisting of a slight positive

adjustment to account for the more favorable zoning of the properties and a negative adjustment to account for expansion opportunities, but, he cautioned, "[t]he opportunity to add additional floors * * * is limited by the location of the buildings in a * * * historic district."  He did not quantify the components of his adjustment.  He adjusted the Pere Marquette Building down by 5 percent to account for more favorable zoning, so we will make a positive adjustment of 5 percent to account for less favorable zoning.

Both appraisers made positive adjustments on account of location, Mr. Roddewig making an adjustment of 10 percent and Mr. Argote making an adjustment of 20 percent.  Mr. Roddewig described the properties' location as "closer to convention center, but slightly further from French Quarter.  Closer to office core."  That is similar to his description for the Pere Marquette Building, for which he made a positive adjustment for location of 20 percent.  We shall make a positive adjustment for location of 20 percent.

We shall make a positive time adjustment of 1.25 percent to account for the small amount of time that elapsed between the purchase of the two properties and the valuation date.

Mr. Argote has persuaded us that a negative adjustment of 10 percent under the heading "Configuration/Layout" is appropriate to account for the properties' traditional New Orleans balconies and courtyards.

We determine an adjusted price per square foot for the Magazine Street and BT Place, as follows:

Adjusted Price Per Square Foot: Magazine Street and BT Place

| | | |
|---|---|---|
| Unadjusted price per square foot | | $28.39 |
| Adjustments: | | |
| Size | -25.00% | |
| Zoning/historic | + 5.00% | |
| Location | +20.00% | |
| Time | + 1.25% | |
| Configuration/layout | -10.00% | |
| Total adjustments | - 8.75% | |
| Multiplier (100% - 8.75% = 91.25%) | x 91.25% | |
| Adjusted price per square foot | | 25.91 |

(v)  Conclusion

The average adjusted price per square foot of the Pere Marquette Building, Bell South Building, and Magazine Street and BT Place buildings is $23.50.  The Maison Blanche Building comprises 514,566 square feet.  Applying the average price under the comparable sales approach to the Maison Blanche Building's total square footage results in a total before restriction value of $12,092,301, which value we find to be its before restriction value under the comparable sales approach.

f.  After Restriction Value

Mr. Roddewig did not determine an after restriction value for the Maison Blanche-Kress parcel under the comparable sales approach because, he testified:  "There are no comparable sales of easement encumbered properties in New Orleans that can be used to value the Maison Blanche Hotel Complex 'after' considering the easement."  Apparently, he limited his research to a set of properties burdened by servitudes benefiting PRC, the

organization to which the servitude was conveyed, and, in that set, he could identify only one postconveyance sale.[25] Nevertheless, his consideration of market data on easement-encumbered properties in Washington, D.C., and Philadelphia led him to conclude that, taking into account that none of that data "involved major rehabilitation projects and a change in use", "an impact from facade restrictions only of 15% is supportable." From a consideration of direct acquisitions of preservation easements in Philadelphia, he concluded that "an impact * * * in the range of 12% to 15%" of the stabilized value of property after rehabilitation and before conveyance is supportable.[26]

Mr. Argote identified five sales of New Orleans buildings that he thought comparable to the Maison Blanche Building and that were encumbered by servitudes at the time of sale. He made

---

[25] Summarizing his research in New Orleans, Mr. Roddewig testified: "In the one sale of a building 'after' imposition of the easement, the purchaser learned of the easement only on the date of closing. He could not renegotiate at such a late date, but wished he had known about the easement before making his offer to purchase."

[26] His full testimony on the point is as follows:

Given the similarity in the content of the Philadelphia and New Orleans easements, but given the substantially larger size of the Maison Blanche Building and the proposed conversion to a hotel, the interference of the easement with signage and window/door openings for retail use, and the fact that the subject property has three street facades that are protected by the easement, an impact from the easement in the range of 12% to 15% when measured against stabilized value following rehabilitation is supportable.

adjustments similar to those he made to his before transaction comparables and determined mean and median values per square foot for the comparables.  Based on those values, he determined that, on the valuation date, after the restriction, the Maison Blanche Building was worth $20 per square foot, for a total value of $10,293,940, which he rounded to $10.3 million.

Petitioner objects to respondent's proposed findings of fact concerning Mr. Argote's identification of his five after restriction comparables and his determination of an after restriction value of $10.3 million principally on the ground that Mr. Argote's direct testimony should be excluded from evidence. We have rejected that ground.  See supra section II of this report.

Petitioner also objects to respondent's proposed finding that Mr. Argote identified five comparables to the Maison Blanche Building on the ground that, in his direct testimony, Mr. Argote failed to show that three of those properties were comparable to the Maison Blanche Building because he did not show that they had the same highest and best use as the Maison Blanche Building.  In his direct testimony, Mr. Argote stated only that the intended uses of those three properties were "Speculative", "Office/Retail", and "Office", respectively.  On cross-examination, however, in response to petitioner's counsel's question as to where in his direct testimony ("page, line, and paragraph") he states the highest and best use of the three

properties, he answered: "We're on a really wrong track here. The highest and best use of those properties was to develop a hotel, even though they were being used for an alternative use." Petitioner asks that we disregard that answer on the ground that Rule 143(f) prohibits Mr. Argote from expanding or supplementing his direct testimony by anything he says on cross-examination. Rule 143(f) deals with expert witness reports and subparagraph (1) thereof establishes the general rule that an expert's direct testimony shall be by written report. That subparagraph allows additional direct testimony to, among other things "clarify or emphasize matters in the report" or "otherwise at the discretion of the Court." Id. Petitioner cites no Tax Court case, and we can find none, interpreting Rule 143(f) to the effect that the Court may not consider testimony elicited from an expert on cross-examination. We do find cases where testimony of an expert on cross-examination is reported by the Court. E.g., Sears, Roebuck & Co. v. Commissioner, 96 T.C. 61, 111 (1991), modified 96 T.C. 671 (1991), affd. in part and revd. in part on other grounds 972 F.2d 858 (7th Cir. 1992); Hunt & Sons, Inc. v. Commissioner, T.C. Memo. 2002-65; Van Duzer v. Commissioner, T.C. Memo. 1992-62, affd. without published opinion 9 F.3d 1555 (9th Cir. 1993). Mr. Argote was of the opinion that highest and best use of the Maison Blanche Building was "for conversion to a hotel/retail complex", and his direct testimony makes clear that he understood the comparable sales approach to involve "a direct

comparison of the property being appraised to <u>similar</u> properties that have sold in the same or in a similar market". (Emphasis added.) Whether he said so specifically or not in his direct testimony, it is clear to us that he understood that the comparables he chose had to have the same highest and best use as the Maison Blanche Building, irrespective of the comparables current or intended use. We think that his testimony on cross-examination clarified his written report, and we shall allow it either as a clarification of his report or as a matter given over to our discretion. See Rule 143(f)(1).

While the servitudes burdening the five properties he chose as comparables were not identical to the servitude, for the most part, all of the servitudes imposed similar burdens: e.g., perpetual restrictions; restrictions on successors and assigns; servitudes covering exteriors and roofs; maintenance requirements; insurance requirements; inspection rights; restrictions on changes; and rights to inspect. We do not think that the differences between the servitudes burdening the five comparables and the servitude were significant. Indeed, the servitude, in allowing the partnership to alter the Maison Blanche Building according to plans to rehabilitate the building for use as a Ritz-Carlton Hotel, including the right to build penthouses on the roof and to install telecommunication devices on the sides of the penthouses, is remarkable in its seeming inconsistency with the goal of preserving the building's historic

facade, and, if anything, would seem to require a positive adjustment with respect to each of the comparables.

Also, while unlike the servitudes burdening all but one of the comparables, the servitude calls for payment of 10 percent of the sales proceeds if the building is sold following a judicial extinguishment of the easement, we agree with respondent that Mr. Argote made no error in ignoring that fact since petitioner has failed to show the risk of judicial extinguishment to be anything but insignificant.  Nor do we think that Mr. Argote erred in ignoring a requirement in the servitude that the partnership expend a minimum of $350,000 in improvements to the facade.  His uncontradicted testimony was that Gary J. Elkins, one of petitioner's counsel, in a letter to Linda J. Wise, one of respondent's counsel, had written that the obligation was not a contractual obligation.  Petitioner has failed to resolve the conflict between that report and the language of the servitude.

We accept Mr. Argote's determination that the after restriction value of the Maison Blanche Building under the comparable sales approach is $10.3 million, and find accordingly. We note that, having found that the before restriction value under that approach is $12,092,301, the after restriction value, $10.3 million, represents a 14.82-percent discount to the before restriction value, a discount about the same as Mr. Roddewig determined from his market studies.

### 3. Conclusion

Based on our findings as to the before and after restriction values of the Maison Blanche Building under the comparable sales approach, we find that, on the valuation date, the value of the servitude under that method was $1,792,301, calculated as follows:

Value of the Servitude Under Comparable Sales Approach

| | |
|---|---|
| Before restriction value | $12,092,301 |
| Less: After restriction value | 10,300,000 |
| Value of the Servitude | 1,792,301 |

### E. Conclusion

We have rejected the cost and income approaches to valuing the servitude. We have found that under the comparable sales approach the value of the servitude on the valuation date was $1,792,301. We accept and find that the fair market value of the servitude on the valuation date was $1,792,301.

## V. Valuation Misstatement Penalty

### A. Introduction

On the 1997 Form 1065, the partnership claimed that the fair market value of the servitude was $7.445 million. We have found that the fair market value of the servitude on the valuation date was $1,792,301. Therefore, on the 1997 Form 1065, the partnership claimed an amount for the value of the servitude slightly more than 415 percent of its correct value.

B. <u>Gross Valuation Misstatement</u>

Section 6662(a) imposes an accuracy-related penalty in the amount of 20 percent of the portion of any underpayment of tax required to be shown on a return in the case of, among other things, any substantial valuation misstatement under subtitle A, chapter 1, of the Internal Revenue Code (a substantial valuation misstatement). See sec. 6662(b)(3). Section 6662(h) increases the penalty to 40 percent in the case of a gross valuation misstatement under that chapter (a gross valuation misstatement). There is a substantial valuation misstatement if the value of any property claimed on the return is 200 percent or more of the amount determined to be the correct amount. Sec. 6662(e)(1)(A). There is a gross valuation misstatement if the value is 400 percent or more of the value determined to be the correct amount. Sec. 6662(h)(2)(A)(i). The applicability of the penalty (except for partner-level defenses) is determined at the partnership level. Sec. 301.6221-1T(c), Temporary Proced. & Admin. Regs., 64 Fed. Reg. 3838 (Jan. 26, 1999); see sec. 6221. Since the partnership overstated the value of the servitude on the 1997 Form 1065 by slightly more than 415 percent, it made a gross valuation misstatement.[27]

---

[27] No penalty is imposed unless the portion of the underpayment attributable to the misstatement exceeds $5,000. Sec. 6662(e)(2). In the case of a misstatement by a partnership, however, that limitation is applied at the level of the taxpayer who bears the burden of the tax on the partnership income. See sec. 1.6662-5(h), Income Tax Regs. Application of the limitation

(continued...)

C.  Reasonable Cause Exception

    1.  Introduction

Petitioner argues, however, that the penalty should be excused under the reasonable cause exception found in section 6664(c)(1).  To qualify for that exception, petitioner must show (1) that "the claimed value of the property was based on a qualified appraisal made by a qualified appraiser," and (2) "in addition to obtaining such appraisal, the taxpayer made a good faith investigation of the value of the contributed property." Sec. 6664(c)(2).  Those are partnership-level determinations. Sec. 301.6221-1T(d), Temporary Proced. & Admin. Regs., 64 Fed. Reg. 3838 (Jan. 26, 1999).[28]  Petitioner bears the burden of proof.  See Santa Monica Pictures, L.L.C. v. Commissioner, T.C. Memo. 2005-104.  Respondent concedes the first requirement.  To satisfy the second requirement, petitioner must establish the fact that, in addition to obtaining a qualified appraisal, it made a good faith investigation of the value of the servitude. Petitioner offers a hotch-pot of arguments that, either together or separately, are not convincing.

_____

[27](...continued)
is not an issue in this proceeding.

[28]  While the validity of sec. 301.6221-1T(c) and (d), Temporary Proced. & Admin. Regs., 64 Fed. Reg. 3838 (Jan. 26, 1999), is being challenged in other cases before the Court, see 7050, Ltd. v. Commissioner, T.C. Memo. 2008-112 n.13 (and accompanying text), the claim of invalidity does not extend to the portion of the regulation stating that the applicability of sec. 6664(c)(2) is a partnership-level determination.

Principally, petitioner relies on the testimony of Robert Drawbridge. Mr. Drawbridge is an employee of an affiliate of petitioner. Petitioner is not only the tax matters partner of the partnership, but it is also the partnership's sole general partner. Mr. Drawbridge serves petitioner as "asset manager" for the partnership. He testified, mostly to the best of his knowledge, as follows. The partnership relied on the appraisal made by Mr. Cohen (the Cohen appraisal) in filing the 1997 Form 1065. The partnership reviewed a second appraisal, dated January 1, 1998, obtained by the then limited partner of the partnership from Revac, Inc., of Houston, Texas (the Revac appraisal), which, among other things, estimated the market value of the Maison Blanche Building (1) before rehabilitation, (2) just after rehabilitation, and (3) upon achieving stabilized occupancy. The partnership relied on professional tax advice it received from its auditors and legal counsel in filing the 1997 Form 1065. A PRC representative signed the Form 8283 attached to the 1997 Form 1065, acknowledging receipt of the servitude.

Following its recounting of that testimony, petitioner concludes in its answering brief: "Clearly, there was sufficient investigation and good faith reliance on the professional valuation that resulted in the charitable donation deduction." To bolster that conclusion, petitioner adds:

> Additionally, the Cohen Appraisal concluded that the diminution percentage in the property's 'before' and 'after' values was only 7.8%, which is significantly lower than those value percentages previously affirmed

by the Tax Court in Nikoladis [sic Nicoladis] v. Commissioner, T.C. Memo. 1988-163 * * * (14.0%), Losch v. Commissioner, T.C. Memo. 1988-230 * * * (16.8%), and Dorsey * * * [v. Commissioner, T.C. Memo. 1990-242] (33.41%).

   2.  Discussion

Preliminarily, we note that Mr. Drawbridge also testified that petitioner became the partnership's general partner on September 15, 2000.  We assume that his responsibilities as asset manager commenced no earlier than that date.  He did not testify as to any personal knowledge of the operations of the partnership before that date, nor did he identify anyone who had informed him about partnership operations before that date.  The 1997 Form 1065 was signed on October 14, 1998, and the question before us is whether, before it was signed, disregarding the Cohen appraisal, someone acting on behalf of the partnership made a good faith investigation of the value of the servitude.  Mr. Drawbridge gave no convincing testimony on that score.

   Even were we to credit his testimony, however, petitioner has failed to make a convincing argument that the partnership made the necessary investigation.  Petitioner considers the Revac appraisal, which estimates that the fair market value of the Maison Blanche Building would be $125 million upon rehabilitation and $135 million upon achieving stabilized occupancy, as supporting the Cohen appraisal, which concluded that the after rehabilitation and before transaction value of the building was $96 million.  Petitioner argues:  "The value reflected in the

Cohen Appraisal, at $96,000,000, to any reasonable person, acting in good faith, would have appeared to be a conservative valuation when compared to the conclusion in the REVAC Appraisal."[29]  The flaw in petitioner's argument is that the good faith investigation that petitioner was required to make was not an investigation of the value of the Maison Blanche Building but an investigation of the value of the servitude.  The before restriction value of a rehabilitated Maison Blanche Building, which Mr. Cohen relied on in his calculation of the diminution in value occasioned by the conveyance of the servitude, is only half the story.  Since the Revac appraisal tells us nothing of the other half of the story, i.e., the value of the Maison Blanche Building after the conveyance of the servitude, it does not confirm the $7.455 million value of the servitude arrived at by Mr. Cohen.  Indeed, the $125 million postrehabilitation value determined in the Revac appraisal exceeds by slightly more than 30 percent the $96 million postrehabilitation and before restriction value determined by Mr. Cohen, which discrepancy, without more, equally brings into question both appraisals.

We know nothing about any professional tax advice the partnership received from its auditors and legal counsel in

---

[29]  At trial, respondent objected to the admission of Exh. 45-P, which is the Revac appraisal.  We overruled respondent's objection and admitted the appraisal.  After trial, respondent moved the Court to reconsider that ruling.  We shall deny the motion since we are not relying upon the Revac appraisal to value the servitude and respondent does not object to its admission for purposes of determinations under sec. 6664.

filing the 1997 Form 1065, so we cannot say that such advice constituted part of a good faith investigation of the value of the servitude.  Also, we fail to see how petitioner's recitation of results in Tax Court cases helps carry its burden of proving that someone on behalf of the partnership carried out the required investigation.

### 3.  Conclusion

Petitioner has failed to prove that, in addition to obtaining the necessary appraisal, it made a good faith investigation of the value of the servitude.  It has, therefore failed to satisfy the conditions of section 6664(c)(2), which are a prerequisite for the application of the reasonable cause exception found in section 6664(c)(1).

### D.  Conclusion

The partnership overstated the value of the servitude on the 1997 Form 1065 by more than 400 percent, and, therefore, it made a gross valuation misstatement.  There is no reasonable cause for the misstatement.  We sustain application of an accuracy-related penalty under section 6662(a) on the basis of a gross valuation misstatement.

## VI.  Conclusion

To reflect the foregoing,

Decision will be entered

under Rule 155.

APPENDIX

```
ACT OF DONATION          *          UNITED STATES OF AMERICA
OF PERPETUAL REAL RIGHTS  *
                          *
        BY                *            STATE OF LOUISIANA
                          *
WHITEHOUSE HOTEL          *
LIMITED PARTNERSHIP       *     PARISH OF ORLEANS [LIVINGSTON]
                          *
        TO                *
                          *
PRESERVATION ALLIANCE     *
OF NEW ORLEANS, INCORPORATED *
d/b/a PRESERVATION RESOURCE  *
  CENTER OF NEW ORLEANS    *
```

BE IT KNOWN, that on this  29th  day of   December  , 1997,

BEFORE ME, undersigned Notary Public, duly commissioned and qualified in and for the Parish of Orleans [Livingston], State of Louisiana, therein residing, and in the presence of the hereinafter named and undersigned witnesses:

PERSONALLY CAME AND APPEARED:

WHITEHOUSE HOTEL LIMITED PARTNERSHIP, (hereinafter referred to as "Owner"), Taxpayer Identification No. 72-1311785, a Louisiana partnership in commendam, appearing herein through its duly authorized General Partner, Whitehouse Hotel, L.L.C., a Louisiana limited liability company, represented herein by its duly authorized Manager, Housing Developers II, L.L.C., represented herein by its duly authorized Manager, J.K.R. Family, L.L.C., represented herein by its duly authorized Manager, Stewart Juneau;

AND

BE IT KNOWN, that on this  23rd  day of   December  , 1997,

BEFORE ME, the undersigned Notary Public, a Notary Public, duly commissioned and qualified in and for the Parish of Orleans, State of Louisiana, therein residing, and in the presence of the hereinafter named and undersigned witnesses:

PERSONALLY CAME AND APPEARED:

PRESERVATION ALLIANCE OF NEW ORLEANS,
INCORPORATED d/b/a PRESERVATION RESOURCE CENTER
OF NEW ORLEANS (hereinafter referred to as
"Donee"), a Louisiana non-profit corporation
organized under §1950, Title 12, Chapter II of
the Louisiana Revised Statutes (R.S. 12:1950),
before Patrick D. Breeden, Notary Public, May
31, 1974, and recorded in the Office of the
Louisiana Secretary of State on June 20, 1974,
the date that corporate existence began, herein
represented by Patricia H. Gay, its Executive
Director, duly authorized to act for said Donee;

WHO HEREBY DECLARE, stipulate, covenant, and
agree as follows:


W I T N E S S E T H:


WHEREAS, Owner possesses full and complete ownership of that certain land ("Land") and the improvement thereon ("Improvement") located in Square 94 of the Second District of the City of New Orleans, Louisiana, which square is bounded by Canal, Burgundy, Iberville, and Dauphine Streets, and more particularly described on Exhibit A attached hereto and made a part hereof (the Land and Improvement are collectively referred to as the "Property"); and

WHEREAS, the Property is shown on that certain survey dated March 17, 1997, prepared by Gandolfo, Kuhn & Associates, Inc. (the "Survey"), a copy of which is attached hereto as Exhibit B and made a part hereof; and

WHEREAS, the Improvement as shown on the Survey consists of a thirteen-story building with the upper seven stories being constructed around a light well facing Dauphine Street;

WHEREAS, the first five stories of the Improvement are referred to herein as the "Lower Stories", and the upper eight stories of the Improvement are referred to herein as the "Upper Stories"; and

WHEREAS, Owner intends to rehabilitate the Improvement and convert it into a luxury hotel and to construct penthouses on the roof of the Improvement (the construction of penthouses on the roof of the Improvement shall be referred to herein as the "Penthouse Addition"); and

WHEREAS, the Penthouse Addition will be constructed in accordance with the approval of the National Park Service of the United States Department of the Interior and in compliance with the Comprehensive Zoning Ordinance of the City of New Orleans,

and in any event shall not exceed thirty (30) feet in height above the roof of the Improvement and shall not be closer than twenty (20) feet to the roof parapet nearest to Dauphine Street; and

WHEREAS, Donee is a non-profit corporation, duly established under the laws of Louisiana, operated exclusively for charitable, educational, and historical purposes in order to facilitate public participation in the preservation of sites, buildings, and objects significant in the history and culture of the City of New Orleans, and in furtherance of such purposes is authorized under Section 1252 of Title 9 of the Louisiana Revised Statutes (R.S. 9:1252(A)) to accept grants of perpetual real rights burdening whole or any part of immovable property, including, but not limited to, the facade, exterior, roof or front of any improvements thereof, in order to protect property significant to such history and culture; and

WHEREAS, Owner warrants that there exists no servitude, lease, mortgage, lien or other interest affecting or encumbering the Property which would prohibit, prime, interfere or otherwise limit the effectiveness of any of the rights and benefits herein created by this Act of Donation of Perpetual Real Rights and granted to Donee except as may be disclosed on the public record; and

WHEREAS, the Property has historical and/or architectural merit and contributes significantly to the architectural and cultural heritage and visual beauty of the City of New Orleans and should be preserved; and

WHEREAS, the scenic and architectural facade servitude donated by the Owner to Donee by this Act of Donation of Perpetual Real Rights is created herein for charitable, educational and historical purposes and will assist in preserving and maintaining the Property and the architectural ensemble of the City of New Orleans; and

WHEREAS, to this end, Owner desires to donate, grant, transfer and convey to Donee, and Donee desires to accept, a scenic, open space and architectural facade servitude as a perpetual real right in and to the exterior surfaces of the Improvement.

NOW, THEREFORE, pursuant to R.S.9:1252, as amended, and in accordance with applicable provisions of the Internal Revenue Code of 1986, as amended, Owner does hereby create, establish, grant, donate, convey and transfer to Donee a perpetual real right (which perpetual real right is more particularly described below) in and to certain exterior surfaces of the Improvement, all of which are owned by Owner (the "Servitude") subject to the right of the Owner to construct the Penthouse Addition on the

roof of the Upper Stories and to those rights reserved to Owner in Paragraph 4 hereof.

This Servitude shall constitute a binding servitude, in perpetuity, upon the exterior surfaces of the Improvement; and to that end, Owner covenants on behalf of Owner and Owner's heirs, successors, and assigns, and all subsequent owners of the Improvement with Donee, its successors and assigns, such covenants being deemed to run as a binding servitude, in perpetuity, with the Land, to do (and refrain from doing), each of the following terms and stipulations, which contribute to the public purpose in that they aid significantly in the preservation of historic property:

1. The exterior surfaces of the Improvement subject to this Servitude are the exterior walls of the Lower Stories which are visible from Canal and Dauphine Streets, the exterior portion of the Improvement above the Lower Stories which is not covered by the Upper Stories, the exterior walls of the Upper Stories which are visible from Canal, Burgundy, Iberville, and Dauphine Streets, and the roof of the Upper Stories subject to Owner's right to construct the Penthouse Addition thereon (the "Facade"). In the event of uncertainty, the exterior surfaces of the Improvement visible in the photographs in Exhibit C shall control.

2. Donee acknowledges that Owner has provided to Donee Plans dated August 7, 1997, (the "Plans") pursuant to which Owner intends to renovate the Improvement, including the Facade, and that such renovation and rehabilitation have been approved by Donee, provided such work is in compliance with the Plans. Owner acknowledges and agrees that it shall make certain improvements to the Facade which shall have a cost of at least $350,000. Owner further acknowledges and agrees that in the event any changes or modifications are made to the Plans which affect the Facade, Owner shall first obtain the prior written approval of Donee before any such changes or modifications are made.

3. Owner agrees at all times to preserve and maintain the Facade in a good and sound state of repair.

4. Without the express written permission of the Donee, its successors or assigns, signed by a duly authorized representative thereof, based upon written plans submitted by Owner to Donee, no construction, change, alteration, remolding, renovation, or any other thing shall be undertaken by Owner or permitted to be undertaken in or to the Facade, which would affect either the height, or alter the exterior of the Facade or the appearance of the Facade, other than as shown on the Plans and the Penthouse Addition, or which would adversely affect the structural soundness of the Improvement. The repair or replacement or reconstruction of any subsequent damage to the Facade which has resulted from casualty loss, deterioration, or wear and tear,

shall be permitted without the prior written approval of Donee, provided that such reconstruction, repair, repainting, or refinishing is performed in a manner which will not alter the appearance of the Facade subject to this Servitude as it is as of even date herewith or as it may subsequently be modified in accordance with the terms hereof. Anything to the contrary notwithstanding in this Act of Donation of Perpetual Real Rights, Owner hereby retains the right (i) to replace any window in the Improvement with a new window which replicates the window which is being replaced so long as Owner does not replace more than ten (10%) percent of the windows in the Improvement and (ii) to affix to the exterior walls of the Penthouse Addition telecommunications devices so long as such devices are mounted as flush to the exterior walls of the Penthouse Addition as possible and are painted a color which is harmonious with the color of the Facade.

5. In all events, Owner, in painting the exterior of the Facade, agrees to obtain the prior written consent of Donee, its successors or assigns, signed by a duly authorized representative thereof, as to the quality and color of paint to be used if significantly different from that presently existing.

6. All work for preserving, maintaining, altering, or renovating the Facade shall be performed and conducted by Owner at Owner's sole cost and expense. Should demolition of the Improvement occur, in whole or in part, other than as provided for in the Plans, or in the event either reconstruction or change, alteration or renovation is performed without the prior written approval of Donee as required herein, Donee shall have the right to require any changes to such work as Donee, in its sole discretion, deems proper. All such construction or changes shall be commenced at Owner's sole cost and expense within sixty (60) days of Donee's written notice to Owner and pursued with diligence until completion, or Donee may compel curative work to be performed at Owner's sole cost and expense, in addition to all rights and remedies provided herein or by law.

7. For the purpose of maintaining and preserving the Facade after it has been renovated and rehabilitated, Donee shall have the right to require the Owner, at Owner's expense, to perform and conduct such repairs and maintenance work reasonably deemed necessary in order to preserve, maintain, or repair the Facade and the structural elements of the Improvement. All such work shall be commenced, at Owner's sole cost and expense, no later than sixty (60) days after Owner's receipt of Donee's written notice, and shall be pursued with due diligence until completion. In the event that said repairs and maintenance work are not completed by Owner within a reasonable time thereafter, Donee may (a) proceed against Owner by summary process in a court of competent jurisdiction to compel such repairs and maintenance, and/or (b) exercise all other rights and remedies provided herein or by law.

8.    All rights granted to Donee herein, including such rights which Donee may exercise pursuant to Paragraph 7 above, shall be exercised in a reasonable and prudent manner and with least possible cost to Owner, calculated so as not to interfere with Owner's reasonable use and enjoyment of the Property while accomplishing the purposes of this Act of Donation of Perpetual Real Rights.

9.    Owner hereby consents and agrees that representatives of Donee, its successors and assigns, shall be permitted to inspect the Property at all reasonable times upon forty-eight (48) hours prior notice given to Owner.  Inspections will normally take place from the street; however, Owner consents and agrees that representatives of Donee, its successors and assigns, shall be permitted to enter and inspect the interior of the Improvement for the purpose of verifying the maintenance of the structural condition and soundness of the Improvement and protecting the rights of Donee herein.  Inspection of the interior will be made at a time mutually agreed upon by the Owner and Donee, its successors and assigns, and Owner covenants not to withhold unreasonably its consent in establishing a date and time for such inspection.  At least once every five (5) years, Owner, at Owner's cost, shall provide to Donee an inspection report of the condition of the Facade and the structural elements of the Improvement, such inspection report to be prepared by a competent licensed structural engineer, or competent licensed roofer, or both, whichever is applicable.  Donee shall have the right to require that the Owner cause an inspection of the Improvement from time to time, upon Donee's reasonable belief that a special inspection is necessary to accomplish the purposes of this Act of Donation of Perpetual Real Rights, including, but not limited to, evidence of deterioration to the Improvement.  Within forty-five (45) days after Donee has notified the Owner of the need for a special inspection, Owner shall deliver to Donee an inspection report prepared by a competent person as above-described. In the event that the Owner fails to provide such inspection reports as are required by this Paragraph 9, Donee may, at the Owner's sole cost and expense, employ for the account of Owner the services of a competent licensed structural engineer and/or a competent licensed roofer and shall submit to Owner all bills and other evidence of fees incurred or paid for such services, which shall be promptly paid by Owner.

10.    In the event of a fire or other casualty which results in damage to or loss or destruction of a part of the Facade or the structural elements of the Improvement, Owner agrees promptly to repair, renovate, or reconstruct the damaged or destroyed parts of the Facade or the structural elements of the Improvement with the prior consent and approval of Donee as otherwise provided herein.

11.    In the event of a total loss or destruction of the Improvement, Owner shall promptly remove all debris and trash and

properly maintain the Land.  Owner must obtain Donee's written approval of and prior consent to any construction or reconstruction of the Improvement, as provided herein.

12.  Owner agrees at all times to carry and maintain such adequate amounts of comprehensive general bodily and property damage liability insurance, property, fire, vandalism, malicious mischief, and extended coverage insurance, general construction liability insurance, and such other standard insurance coverages as may be reasonably required by Donee.  The policies of insurance required to be obtained pursuant to this Paragraph 12 shall name Donee as a co-insured as its interest appears herein. If the Improvement is uninsurable, Owner shall provide such other protection which in the reasonable discretion of Donee is necessary and advisable for the maintenance and preservation of the Improvement, at Owner's sole cost and expense.  Donee shall be provided with copies of said policies. Donee shall have the right to provide such insurance at Owner's cost and expense and lien the Property for the cost of the premiums in the event Owner fails to obtain the required policies.

13.  Owner shall provide to Donee written notice of the Owner's sale or other disposition of the Property, or any part thereof, at the time of such sale or other disposition or as soon as practicable thereafter, but in no event more than seven (7) days following such sale.  Owner shall insert in any agreement to sell the Property (or any part thereof) or in any act of sale of the Property (or any part thereof) a provision expressly setting forth that the Property and the purchaser thereof are subject to and bound by this Act of Donation of Perpetual Real Rights and all covenants, obligations, agreements and restrictions herein. The written notice required to be made by Owner under this Paragraph 13 shall contain the name and address of any purchaser and the name and address of a local agent and attorney-in-fact for an absentee purchaser.

14.  In the event the Property is subdivided into condominium units, time-sharing units, or other forms of multiple ownership, Owner and its heirs, successors, vendees or assigns agree to appoint and maintain a single agent and attorney-in-fact residing in the Parish of Orleans with whom Donee shall be authorized to deal exclusively in order to enforce Donee' s rights under this Act of Donation of Perpetual Real Rights.

15.  Owner agrees to and does herewith grant, transfer and convey to Donee all "development rights" applicable to the Property as provided for in the City of New Orleans Comprehensive Zoning Ordinance other than as shown on the Plans and the Penthouse Addition, as well as all privileges to transfer, sell, or otherwise trade or bargain for such "development rights," in the name of Owner but for the benefit of Donee.  Owner agrees to

cooperate with Donee as necessary in any such transfer, with all costs of such transfer to be paid by Donee and all benefits therefrom accruing to Donee.

16. No signs, markers, notices, billboards, advertisements, plaques, decorations or other items shall be displayed, erected, mounted or placed on the Facade except as set forth on the Plans or without the prior express written consent of Donee, which consent Donee may withhold in its reasonable and sole discretion.

17. The rights, interests, obligations and benefits herein constitute, individually and collectively, a perpetual real right which vests immediately in Donee upon the execution of this Act of Donation of Perpetual Real Rights and shall be binding on Owner, its heirs, successors and assigns, and on all subsequent owners of the Property. Owner agrees and acknowledges that the Servitude shall have a fair market value at all times that is at least equal to the proportionate value that the Servitude as of the date of donation bears to the total value of the Property as of the date of donation, and that such proportionate value of the Servitude shall remain constant and recognized henceforth and forevermore. Such proportionate value is hereby agreed by the parties hereto to be ten (10%) percent. Owner further agrees and acknowledges that in the event of a change in conditions which would give rise to the judicial extinguishment of the restrictions and obligations imposed hereunder with respect to the Facade, the Donee, on a subsequent sale, exchange, or involuntary conversion of the Property, shall be entitled to a portion of the proceeds of such sale, exchange, or involuntary conversion at least equal to the constant proportionate value of the Servitude.

18. Donee agrees and binds itself to use all of the proceeds it receives from a sale, exchange, or involuntary conversion of the Property, resulting from a judicial proceeding which extinguishes Donee's real rights, in a manner consistent with the conservation purposes of the original donation.

19. The parties hereto contemplate that the Servitude is a perpetual conservation restriction within the meaning of Sections 1.170-13 and 1.170-14 of the Regulations of the Department of Treasury, and, for federal income tax purposes, the donation of this perpetual real right is the contribution of a qualified real property interest to a qualified organization exclusively for conservation purposes.

20. In the event that the Donee shall at any time in the future acquire full and complete ownership of the Property, Donee for itself, its successors and assigns, covenants and agrees, in the event of subsequent conveyances of such Property to another, to create a new perpetual real right containing the same restrictions and provisions as are contained herein, and either to retain such perpetual real right in itself or to convey such

real right to a similar local or national organization whose purposes, _inter_ _alia_, are to promote historic preservation.

21. Any right or obligation imposed upon the Owner of the Property by the Servitude, including any covenant, restriction or affirmative obligation herein, shall be enforceable by the Donee, following reasonable notice to Owner, through judicial proceeding by actions for temporary and/or permanent injunction to enjoin such violations and to require the performance of all obligations imposed on Owner by this Act of Donation of Perpetual Real Rights, or, in the alternative, representatives of Donee, its successors and assigns, may enter upon the Property, correct any violation, and hold Owner and Owner's heirs, successors and assigns, responsible for the cost thereof in an action for damages brought by Donee. Donee, its successors or assigns, shall have available all other legal and equitable remedies permitted by law to enforce Owner's obligations hereunder. In the event Owner is found to have violated any of its obligations arising from this Act of Donation of Perpetual Real Rights, Owner agrees to indemnify and hold harmless Donee from all reasonable attorneys' fees, expert witness charges, and other charges, fees, and costs paid or incurred by Donee in the enforcement of any of its rights granted herein.

22. All other rights of ownership that do not conflict with the exercise of Donee's rights hereunder shall be and are hereby retained by Owner. Owner shall have the right to use the Property and the Improvement for whatever lawful purpose Owner deems necessary, except as to rights herein granted. Owner agrees not to perform any work or make any use of the Property which would adversely affect Donee's full exercise and enjoyment of the perpetual real rights created herein. Owner agrees to pay all real estate taxes and real property assessments on the Property and agrees to hold Donee harmless in connection therewith.

23. Donee acknowledges that in order to finance the rehabilitation of the Improvement, Owner may sell the Property to a third party and lease the Property from such third party for the term of such financing. In such event, Owner, as lessee of such third party, shall be responsible for all monetary obligations of Owner under this Act of Donation of Perpetual Real Rights. Donee agrees that notwithstanding any provision herein to the contrary, during the term of any such lease from such third party to Owner, Donee shall enforce such monetary obligations solely against Owner or, in default thereof, against the Property, _in_ _rem_.

24. Owner, its successors or assigns, will do and perform at Owner's cost all acts necessary to the prompt filing for registry of this Act of Donation of Perpetual Real Rights in the conveyance records of the Parish of Orleans wherein the Property is located.

THUS DONE AND PASSED in my office at ~~New Orleans~~ [Denham Springs], Louisiana, on the day, month, and year herein first above written, in the presence of the two undersigned competent witnesses, who hereunto sign their names with the said appearers and me, Notary, after reading of the whole.

WITNESSES:                          OWNER:

                                    WHITEHOUSE HOTEL LIMITED
                                    PARTNERSHIP
                                    By: Whitehouse Hotel, L.L.C.
                                         Its: General Partner


_____[signature]_____           By: Housing Developers II,
                                    L.L.C.
                                         Its: Manager


_____[signature]_____           By: J.K.R. Family, L.L.C.
                                         Its: Manager


                                    By: ____[signature]____
                                    Stewart Juneau
                                         Its: Manager




            _____[signature]_____
            NOTARY PUBLIC

THUS DONE AND PASSED in my office at New Orleans, Louisiana, on the day, month, and year herein first above written, in the presence of the two undersigned competent witnesses, who hereunto sign their names with the said appearer and me, Notary, after reading of the whole.

DONEE:

WITNESSES:

PRESERVATION ALLIANCE OF NEW ORLEANS, INCORPORATED d/b/a PRESERVATION RESOURCE CENTER

_____[signature]_____

By: _____[signature]_____
        Patricia H. Gay
        Its: Executive Director

_____[signature]_____

_____[signature]_____
NOTARY PUBLIC